# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| WILLIAM E. HATTAWAY, Individually and on Behalf of All Others Similarly Situated, | Case No. 8:22-cv-01298-WFJ-SPF |
| Plaintiff, | |
| v. | |
| APYX MEDICAL CORPORATION, CHARLES D. GOODWIN II, and TARA SEMB, | <u>Demand for a Jury Trial</u> |
| Defendants | |

## <u>PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

# TABLE OF CONTENTS

NATURE OF THE ACTION ............................................................................. 1

JURISDICTION AND VENUE ........................................................................ 3

PARTIES ......................................................................................................... 4

BACKGROUND .............................................................................................. 7

FALSE AND MISLEADING STATEMENTS ...............................................10

POST CLASS PERIOD EVENTS ..................................................................29

CLASS ACTION ALLEGATIONS ................................................................34

LOSS CAUSATION .......................................................................................36

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ............................................................................38

NO SAFE HARBOR .......................................................................................39

COUNT I ........................................................................................................40

COUNT II .......................................................................................................42

PRAYER FOR RELIEF ..................................................................................43

JURY DEMAND ............................................................................................44

William E. Hattaway ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (1) review and analysis of regulatory filings made by Apyx Medical Corporation ("Apyx" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (2) review and analysis of press releases and media reports issued and disseminated by Apyx; and (3) review of other publicly available information concerning Apyx.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons and/or entities who purchased or acquired the Company's securities between May 12, 2021 and March 11, 2022, inclusive ("Class Period"). Plaintiff seeks remedies pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Apyx claims to be an advanced energy technology company with products in the cosmetic and surgical markets. Nearly 80% of its revenue is derived from the Advanced Energy segment, which consists of the Company's helium plasma technology that is marketed and sold as Renuvion (in the cosmetic surgery market) and J-Plasma (in the hospital surgical market).

3.      On March 14, 2022, Apyx disclosed that the U.S. Food and Drug Administration ("FDA") would be posting a Medical Device Safety Communication ("MDSC") related to the Company's Advanced Energy Products. The Company further disclosed that "[b]ased on our initial interactions with the FDA, we believe the Agency's MDSC will pertain to the use of our Advanced Energy products outside of their FDA-cleared indication for general use in cutting, coagulation, and ablation of soft tissue during open and laparoscopic surgical procedures."

4.      Specifically, the FDA warned that physicians should stop using certain Apyx medical devices to treat skin wrinkles after receiving multiple reports involving severe burns, nerve damage, and other potentially life-threatening injuries.  The FDA's warning indicated that the devices had not been approved for aesthetic skincare procedures and urged doctors to stop using them for such purposes immediately to avoid causing serious harm to patients.

5.      On this news, the Company's stock fell $4.02, or 40.6%, to close at $5.88 per share on March 14, 2022, on unusually heavy trading volume.

6.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that a significant number of

2

Apyx's Advanced Energy products were used for off-label indications; (2) that such off-label uses led to an increase in the number of medical device reports filed by Apyx reporting serious adverse events; (3) that, as a result, the Company was reasonably likely to incur regulatory scrutiny; (4) that, as a result of the foregoing, the Company's financial results would be adversely impacted; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

10.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

3

11. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

## PARTIES

12. As set forth in the previously filed certification which is incorporated by reference herein, Plaintiff William E. Hattaway purchased the Company's securities during the Class Period and has been damaged thereby.

13. Defendant Apyx is incorporated under the laws of Delaware with its principal executive offices located in Clearwater, Florida. Apyx's common stock trades on the NASDAQ exchange under the symbol "APYX."

14. Defendant Charles D. Goodwin II ("Goodwin") was Apyx's Chief Executive Officer ("CEO") at all relevant times.

15. Defendant Tara Semb ("Semb") was Apyx's Chief Financial Officer ("CFO") at all relevant times.

16. Defendants Apyx, Goodwin, and Semb are collectively referred to herein as "Defendants." Defendants Goodwin and Semb are collectively referred to herein as the "Individual Defendants."

4

17.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company. Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

18.    The Individual Defendants are liable as direct participants in the wrongs alleged herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful

conduct alleged. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

19. The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

20. The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose securities were, and are, governed by the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's securities would be based upon truthful

and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's securities by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's securities; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its securities, and gain access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's securities at artificially inflated prices.

## BACKGROUND

22.    Apyx was incorporated in 1982 under the laws of the State of Delaware and has its principal executive office at 5115 Ulmerton Road, Clearwater, FL 33760.

23.    The Company claims to be an advanced energy technology company with several products, including its Helium Plasma Technology products marketed and sold as Renuvion in the cosmetic surgery market and J-Plasma in the hospital surgical market. Apyx claims that Renuvion and J-

7

Plasma offer surgeons a unique ability to provide controlled heat to tissue to achieve their desired results. The Company also claims to leverage its expertise and experience in unique waveforms through OEM agreements with other medical device manufacturers.

24.    As part of its plan to accelerate and fully fund the development of its advanced energy business, with a focus in the cosmetic surgery market, the Company sold its Core business in 2018 for gross proceeds of $97 million. These proceeds were used to launch broad marketing and sales initiatives which resulted in rapid sales growth through December 31, 2021 and into the first quarter of 2022. This planned growth in the business was accompanied by scaled operations, including procurement of components, expanded manufacturing capacity to turn those materials into saleable inventory, additional discretionary expenditures, including increased global participation at trade shows, additional employee trainings, user meetings, increased travel and entertainment expenses, more expansive research and development projects, and additional headcount to support those activities. Additionally, the Company had significant non-recurring discretionary expenditures associated with completing its multi-year marketing initiatives related to its dermal resurfacing and skin laxity clearances.

25.    Apyx's Renuvion and J-Plasma systems use radiofrequency energy and helium to generate plasma, which is used to cut, coagulate, and

8

eliminate soft tissue with heat during general surgical procedures. While the devices were cleared by the FDA for use during open and laparoscopic procedures, the FDA became aware of multiple reported injuries arising from healthcare providers using these devices during cosmetic skin procedures.

26. On March 14, 2022, the FDA posted a Safety Communication that warned consumers and health care providers against the use of the Company's Advanced Energy products outside of their FDA-cleared indications for general use in cutting, coagulation, and ablation of soft tissue during open and laparoscopic surgical procedures. According to the warning, the FDA received multiple reports indicating patients who underwent aesthetic skin care procedures using the Renuvion and J-Plasma devices suffered serious and potentially life-threatening adverse events.

27. Injuries from the Renuvion and J-Plasma devices included second- and third- degree burns, infection, change in skin color, scars, nerve damage, significant bleeding, and air or gas accumulation under the skin, in body cavities, and in blood vessels. The FDA also become aware of several incidents in which injuries caused by Renuvion and J-Plasma required treatment in an intensive care unit.

28. Following the FDA's Safety Communication, the Company experienced slowed demand for the adoption of its Helium Plasma Technology.

## FALSE AND MISLEADING STATEMENTS

29.    The Class Period begins on May 12, 2021.  On that day, Apyx

announced its financial results for 1Q21:

> **CLEARWATER, FL — MAY 12, 2021 – Apyx® Medical Corporation (NASDAQ:APYX)** (the "Company"), a maker of medical devices and supplies and the developer of Helium Plasma Technology, marketed and sold as Renuvion® in the cosmetic surgery market and J-Plasma® in the hospital surgical market, today reported financial results for its first quarter ended March 31, 2021, and updated financial expectations for the full year ending December 31, 2021.

> **First Quarter 2021 Financial Summary:**

> - Total revenue of $8.6 million, up 72.9% year-over-year.
>   - Advanced Energy revenue of $7.7 million, up 92.2% year-over-year.
>   - OEM revenue of $1.0 million, down 3.3% year-over-year.
> - Net loss of $4.9 million, compared to net loss of $2.0 million for the first quarter of 2020. Net loss in the first quarter of 2020 included an income tax benefit of $4.9 million.
> - Adjusted EBITDA loss of $3.4 million, compared to adjusted EBITDA loss of $5.8 million for the first quarter of 2020.
> - As of March 31, 2021, the Company had cash and cash equivalents of $39.5 million, compared to $41.9 million as of December 31, 2020. As of March 31, 2021, the Company had working capital of $53.3 million, including expected cash tax refunds of approximately $7.5 million the Company expects to receive during 2021 related to the net operating loss carrybacks resulting from the 2020 CARES Act.

> **Management Comments:**

> "I would like to commend our team on their exceptional efforts during the quarter, which enabled us to achieve first quarter revenue results that exceeded our expectations, driven by strong global sales of our Advanced Energy products," said Charlie Goodwin, President and Chief Executive Officer. "In spite of the continued impacts of the COVID-19 pandemic, ***we continued to see healthy utilization of our Helium Plasma Technology in the U.S. and key international markets, resulting in total handpiece growth in excess of 100% year-over-year***. We were also excited to see global

generator sales increase by more than 80% year-over-year, which was driven by strong demand in both the U.S. and our existing international markets. Importantly, we complemented our strong global sales performance in the first quarter with notable margin improvements, due in part to our efforts to reduce the per unit manufacturing costs of our Advanced Energy handpieces and managing our discretionary spending appropriately given the current operating environment."

30.    Also on May 12, 2021, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2021.  The Form 10-Q incorporated by reference the risk factors stated in Apyx's fiscal 2020 annual report ("2020 10-K").  In relevant part, the 2020 10-K stated:

> We are subject to costly and complex laws and governmental regulations and any adverse regulatory action may materially adversely affect our financial condition and business operations.
>
> * * *
>
> *If the FDA were to conclude that we are not in compliance with applicable laws or regulations, or that any of our medical products are ineffective or pose an unreasonable health risk, they could ban such medical products, seize adulterated or misbranded medical products, order a recall, repair, replacement, correction, or refund of such products, refuse to grant pending pre-market approval applications, refuse to issue export certificates for foreign governments, or require us to notify health professionals and others that the devices present unreasonable risks of substantial harm to the public health.*
>
> * * *
>
> *In addition, the FDA has taken the position that device manufacturers are prohibited from promoting their products other than for the uses and indications set forth in the cleared product labeling. Any failure to comply could subject us to significant civil or criminal exposure, administrative obligations and costs, other potential penalties from, and/or agreements with, the federal government. Governmental regulations worldwide have, and may continue to become, increasingly stringent and customary.*

11

31.    On May 12, 2021, Apyx also held an earnings call to discuss the Company's financial results for 1Q21.  During the call, CEO Goodwin stated the following:

> *The year-over-year increase in total revenue was driven exclusively by our sales of our Advanced Energy Products, which increased 92% year-over-year to $7.7 million, more than offsetting a modest decline in our OEM business, which decreased 3% year-over-year to $1 million.*

32.    Defendants' statements in ¶¶29-31 were materially false and misleading.  As Apyx admitted in its May 12, 2022 conference call, the Company received feedback from the FDA requesting changes to Apyx's messaging on its website, labeling, and training materials with respect to the off-label use of its products.  The Company admitted further that the FDA requested stronger statements in Apyx's labeling to warn of any specific procedure intended to improve the appearance of skin which had not yet been reviewed or cleared by the agency. Additionally, Apyx admitted that the FDA also requested the Company to remove instances of language or imagery that might imply intended use outside of the cleared general indications.  Thus, Defendants failed to disclose that they were aware that the growth in the Company's products, including Renuvion and J-Plasma, was artificially inflated by off-label use, and that the risk posed by such use through FDA regulation severely impacted the Company's financial condition.  Defendants

also failed to disclose that the Company's purported risk disclosures were materially false and misleading because the purported risks had already materialized and were greater in magnitude than Defendants portrayed.

33.    The accounts of former employees further demonstrate the false and misleading nature of Defendants' statements.  CW1 served as a Senior Surgical Device Specialist at Apyx from October 2018 to January 2020. During CW1's tenure, CW1 learned that physicians frequently used the Company's products without receiving proper training.  CW1 also stated that physicians used Renuvion for dermal resurfacing, which CW1 described as problematic.  CW1 had conversations about CW1's concerns with CW1's former manager, Stephanie Van Skike ("Van Skike"), the Western United States Senior Regional Director, as well as other colleagues, including Jeff Kirchman and Sabrina Janeka, a sales specialist in Texas.  CW1 stated that when CW1 raised concerns to Van Skike, the response CW1 received was "nothing helpful" because "it was all about the numbers."  CW1 stated further that people were asking about off-label uses of the Company's products "all the time" and that many of the Company's representatives would view such inquiries as sales opportunities.  CW1 stated that several members of Apyx's clinical team would discuss other territories where representatives would promote off-label use or would train people, which CW1 also described as problematic.

13

34.    Additionally, CW2 served as an Associate Sales Representative at Apyx from August 2019 to November 2020.  CW2 stated that the Company's sales representatives used DocMatter (an internet-enabled and human-supported collaboration flatform built by and for physicians) to monitor the use of the Company's products.  According to CW2, during CW2's tenure, there were numerous conversations on DocMatter regarding the use of Renuvion for dermal resurfacing.  CW2 stated that Apyx worked with the DocMatter team, and that once physicians purchased the device, they received an invitation from DocMatter.  According to CW2, the Company's salespeople viewed DocMatter as a great sales tool, and the Company was aware that physicians posted on DocMatter regarding numerous instances using Renuvion for dermal resurfacing.

35.    On August 12, 2021, Apyx issued a press release announcing its financial results for 2Q21.  Within the press release, the Company stated the following:

> **CLEARWATER, FL — August 12, 2021 – Apyx® Medical Corporation (NASDAQ:APYX)** (the "Company"), a maker of medical devices and supplies and the developer of Helium Plasma Technology, marketed and sold as Renuvion® in the cosmetic surgery market and J-Plasma® in the hospital surgical market, today reported financial results for its second quarter ended June 30, 2021 and updated its financial outlook for the full year ending December 31, 2021.
>
> **Second Quarter 2021 Financial Summary:**
>
> •     Total revenue of $11.2 million, up 161% year-over-year.

14

- ▪ Advanced Energy revenue of $10.0 million, up 248% year-over-year.
- ▪ OEM revenue of $1.2 million, down 13% year-over-year.
- Net loss attributable to stockholders of $4.0 million, compared to net loss of $4.7 million for the second quarter of 2020. Net loss in the second quarter of 2020 included an income tax benefit of $1.5 million.
- Adjusted EBITDA loss of $2.4 million, compared to adjusted EBITDA loss of $4.9 million for the second quarter of 2020.
- As of June 30, 2021, the Company had cash and cash equivalents of $34.7 million, compared to $41.9 million as of December 31, 2020. As of June 30, 2021, the Company had working capital of $50.8 million, including expected cash tax refunds of approximately $7.5 million the Company expects to receive during 2021 or 2022 related to the net operating loss carrybacks resulting from the 2020 CARES Act.

**Second Quarter 2021 Operating Highlights:**

- On June 1, 2021, the Company announced that it had submitted a 510(k) premarket notification to the U.S. Food and Drug Administration ("FDA"), which is intended to obtain a specific clinical indication for the use of Renuvion® in dermal resurfacing procedures.

**Management Comments:**

*"We are pleased to deliver exceptional growth in sales of our Advanced Energy products which exceeded our expectations for the second quarter, reflecting solid execution by our team and continued improvement in the broader operating environment," said Charlie Goodwin, President and Chief Executive Officer. "Most notably, we saw impressive growth in global sales of our Advanced Energy handpieces, which increased by over 270% year-over-year, driven by utilization-based demand both domestically and internationally. We were also pleased to see important contributions from global sales of our generators, which increased by more than 210% year-over-year, reflecting strong adoption of our technology in the U.S. and key international markets as the capital equipment environment continued to recover."*

15

36.    Also on August 12, 2021, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2021.   The Form 10-Q also incorporated by reference the risk factors stated in Apyx's 2020 10-K as set forth in ¶30 above.

37.    On August 12, 2021, Apyx also held an earnings call to discuss the Company's financial results for 2Q21.   During the call, Defendant Goodwin stated the following:

> In the second quarter, we were proud to achieve total revenue growth of 161% year-over-year to $11.2 million, exceeding the 101% to 112% growth expectations that we communicated on our earnings call in May. By geographic region, total U.S. sales grew by 118% year-over-year to $7.4 million, and total international sales grew by 325% year-over-year to $3.8 million. By segment, our total revenue growth was fueled by strong sales of our advanced energy products, which increased 248% year-over-year to $10 million, while sales in our OEM business decreased 13% year-over-year to $1.2 million.
>
> **We delivered second quarter growth in each of our segments that exceeded the expectations we outlined on our Q1 call. The performance in our Advanced Energy business showed particularly impressive strength with growth nearly 70 percentage points above the high end of our guidance expectations. We believe our second quarter sales performance reflected the solid execution of our team and the continued improvement in the broader operating environment, which enabled us to achieve better-than-expected sales results, both in the U.S. and internationally.**
>
> *       *       *
>
> Stepping back, we couldn't be more pleased with the efforts of our team during the second quarter and with the performance that we saw in our Advanced Energy business overall, especially our global handpiece sales growth. It's important to note that our Advanced Energy sales growth is not just a result of easier year-over-year comparison. **We saw notable improvements across all aspects of our Advanced**

16

***Energy business in the second quarter of 2021 compared to the second quarter of 2019 as well, with advanced energy sales up 87% over quarter 2 of '19***. We are encouraged by the continued evidence that our business trends are continuing to improve, which gives us further confidence in our outlook for 2021. In addition to our exceptional sales performance in Q2, I'm pleased to report that we also delivered material improvements in both net loss to common shareholders and adjusted EBITDA loss as well.

38.    Defendants' statements in ¶¶35-37 were materially false and misleading.   As Apyx admitted in its May 12, 2022 conference call, the Company received feedback from the FDA requesting changes to Apyx's messaging on its website, labeling, and training materials with respect to the off-label use of its products.   The Company admitted further that the FDA requested stronger statements in Apyx's labeling to warn of any specific procedure intended to improve the appearance of skin which had not yet been reviewed or cleared by the agency. Additionally, Apyx admitted that the FDA also requested the Company to remove instances of language or imagery that might imply intended use outside of the cleared general indications.   Thus, Defendants failed to disclose that they were aware that the growth in the Company's products, including Renuvion and J-Plasma, was artificially inflated by off-label use, and that the risk posed by such use through FDA regulation severely impacted the Company's financial condition.   Defendants also failed to disclose that the Company's purported risk disclosures were materially false and misleading because the purported risks had already materialized and were greater in magnitude than Defendants portrayed.

17

39.    The accounts of former employees further demonstrate the false and misleading nature of Defendants' statements.  CW1 served as a Senior Surgical Device Specialist at Apyx from October 2018 to January 2020. During CW1's tenure, CW1 learned that physicians frequently used the Company's products without receiving proper training.  CW1 also stated that physicians used Renuvion for dermal resurfacing, which CW1 described as problematic.    CW1 had conversations about CW1's concerns with CW1's former manager, Van Skike, as well as other colleagues, including Jeff Kirchman and Sabrina Janeka, a sales specialist in Texas.  CW1 stated that when CW1 raised concerns to Van Skike, the response CW1 received was "nothing helpful" because "it was all about the numbers."  CW1 stated further that people were asking about off-label uses of the Company's products "all the time" and that many of the Company's representatives would view such inquiries as sales opportunities.  CW1 stated that several members of Apyx's clinical team would discuss other territories where representatives would promote off-label use or would train people, which CW1 also described as problematic.

40.    Additionally, CW2 served as an Associate Sales Representative at Apyx from August 2019 to November 2020.  CW2 stated that the Company's sales representatives used DocMatter to monitor the use of the Company's products.    According to CW2, during CW2's tenure, there were numerous

18

conversations on DocMatter regarding the use of Renuvion for dermal resurfacing. CW2 stated that Apyx worked with the DocMatter team, and that once physicians purchased the device, they received an invitation from DocMatter. According to CW2, the Company's salespeople viewed DocMatter as a great sales tool, and the Company was aware that physicians posted on DocMatter regarding numerous instances using Renuvion for dermal resurfacing.

41.    On November 11, 2021, Apyx issued a press release announcing its financial results for 3Q21. Within the press release, the Company stated the following:

> **CLEARWATER, FL — November 11, 2021 – Apyx® Medical Corporation (NASDAQ:APYX)** (the "Company"), a maker of medical devices and supplies and the developer of Helium Plasma Technology, marketed and sold as Renuvion® in the cosmetic surgery market and J-Plasma® in the hospital surgical market, today reported financial results for its third quarter ended September 30, 2021 and updated its financial outlook for the full year ending December 31, 2021.
>
> **Third Quarter 2021 Financial Summary:**
>
> - Total revenue of $11.8 million, up 70% year-over-year.
>   - Advanced Energy revenue of $10.3 million, up 88% year-over-year.
>   - OEM revenue of $1.5 million, up 3% year-over-year.
> - Net loss attributable to stockholders of $4.2 million, compared to net loss attributable to stockholders of $3.7 million for the third quarter of 2020. Net loss attributable to stockholders in the third quarter of 2020 included an income tax benefit of $0.7 million.
> - Adjusted EBITDA loss of $2.7 million, compared to adjusted EBITDA loss of $3.1 million for the third quarter of 2020.
> - At September 30, 2021, the Company had cash and cash equivalents of $30.9 million, compared to $41.9 million as of

December 31, 2020. At September 30, 2021, the Company had working capital of $48.2 million, including expected cash tax refunds of approximately $7.5 million the Company expects to receive during 2021 or 2022 related to the net operating loss carrybacks resulting from the 2020 CARES Act.

**Third Quarter 2021 Operating Highlights:**

- On August 30, 2021, the Company announced the appointment of Wendy Levine to the Board of Directors, effective August 25, 2021. Ms. Levine serves as a Director and member of the Regulatory Compliance Committee.

**Management Comments:**

*"We are excited by our team's impressive execution during the third quarter, which enabled us to achieve 88% growth year-over-year in sales of our Advanced Energy products. Our Advanced Energy sales growth was driven primarily by strong, global utilization of our Advanced Energy handpieces, with global handpiece sales increasing more than 100% year-over-year. We also saw global Advanced Energy generator sales increase by more than 70% year-over-year, primarily reflecting healthy adoption of our Renuvion technology in the U.S. cosmetic surgery market."*

42.    Also on November 11, 2021, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2021.  The Form 10-Q also incorporated by reference the risk factors stated in Apyx's 2020 10-K as set forth in ¶30 above.

43.    On November 11, 2021, Apyx also held an earnings call to discuss the Company's financial results for 3Q21.   During the call, Defendant Goodwin stated the following:

Looking at the results in our Advanced Energy segment. Our Advanced Energy sales growth exceeded our expectations for the quarter, driven primarily by strong growth in global sales of our handpieces, along

20

with demand for our generators in the U.S. Global sales of our handpieces increased more than 100% year-over-year. We were pleased to see that this growth was diversified with strong contributions from sales to both our U.S. customers and international distributors, reflecting strong utilization-based demand for our global customer base. The greater than 100% increase in global handpiece sales in Q3 was especially notable given the emergence of the Delta variant during the third quarter and the return of the typical seasonality that we experience each year as surgeons tend to take vacations in the latter months of summer.

44.    Defendants' statements in ¶¶41-43 were materially false and misleading.  As Apyx admitted in its May 12, 2022 conference call, the Company received feedback from the FDA requesting changes to Apyx's messaging on its website, labeling, and training materials with respect to the off-label use of its products.  The Company admitted further that the FDA requested stronger statements in Apyx's labeling to warn of any specific procedure intended to improve the appearance of skin which had not yet been reviewed or cleared by the agency. Additionally, Apyx admitted that the FDA also requested the Company to remove instances of language or imagery that might imply intended use outside of the cleared general indications.  Thus, Defendants failed to disclose that they were aware that the growth in the Company's products, including Renuvion and J-Plasma, was artificially inflated by off-label use, and that the risk posed by such use through FDA regulation severely impacted the Company's financial condition.  Defendants also failed to disclose that the Company's purported risk disclosures were

21

materially false and misleading because the purported risks had already materialized and were greater in magnitude than Defendants portrayed.

45.    The accounts of former employees further demonstrate the false and misleading nature of Defendants' statements.  CW1 served as a Senior Surgical Device Specialist at Apyx from October 2018 to January 2020. During CW1's tenure, CW1 learned that physicians frequently used the Company's products without receiving proper training.  CW1 also stated that physicians used Renuvion for dermal resurfacing, which CW1 described as problematic.   CW1 had conversations about CW1's concerns with CW1's former manager, Van Skike, as well as other colleagues, including Jeff Kirchman and Sabrina Janeka, a sales specialist in Texas.  CW1 stated that when CW1 raised concerns to Van Skike, the response CW1 received was "nothing helpful" because "it was all about the numbers."  CW1 stated further that people were asking about off-label uses of the Company's products "all the time" and that many of the Company's representatives would view such inquiries as sales opportunities.  CW1 stated that several members of Apyx's clinical team would discuss other territories where representatives would promote off-label use or would train people, which CW1 also described as problematic.

46.    Additionally, CW2 served as an Associate Sales Representative at Apyx from August 2019 to November 2020.  CW2 stated that the Company's

22

sales representatives used DocMatter to monitor the use of the Company's products. According to CW2, during CW2's tenure, there were numerous conversations on DocMatter regarding the use of Renuvion for dermal resurfacing. CW2 stated that Apyx worked with the DocMatter team, and that once physicians purchased the device, they received an invitation from DocMatter. According to CW2, the Company's salespeople viewed DocMatter as a great sales tool, and the Company was aware that physicians posted on DocMatter regarding numerous instances using Renuvion for dermal resurfacing.

47. On January 10, 2022, Apyx issued a press release announcing its preliminary fourth quarter and full year 2021 financial results. Within the press release, the Company stated the following:

> **CLEARWATER, FL — JANUARY 10, 2022 – Apyx® Medical Corporation (NASDAQ:APYX)** (the "Company"), a maker of medical devices and supplies and the developer of Helium Plasma Technology, marketed and sold as Renuvion® in the cosmetic surgery market and J-Plasma® in the hospital surgical market, today reported preliminary revenue results for the fourth quarter and full year ended December 31, 2021.
>
> **Preliminary Fourth Quarter 2021 Revenue Summary:**
>
> - Total revenue in a range of $16.3 to $16.8 million, representing growth of 42% to 46% year-over-year.
>   - Advanced Energy revenue in a range of $14.7 to $15.0 million, representing growth of 49% to 52% year-over-year.
>   - OEM revenue in a range of $1.5 to $1.7 million, representing a decline of 2% year-over-year to growth of 10% year-over-year.

23

**Preliminary Full Year 2021 Revenue Summary:**

- Total revenue in a range of $48.0 to $48.5 million, representing growth of 73% to 75% year-over-year.
  - Advanced Energy revenue in a range of $42.7 to $43.0 million, representing growth of approximately 92% to 93% year-over-year.
  - OEM revenue in a range of $5.3 to $5.5 million, representing a decline of 4% to 0% year-over-year.

**Management Comments:**

"Sales results in the fourth quarter far exceeded our expectations," said Charlie Goodwin, President and Chief Executive Officer. "Our fourth quarter sales performance was driven by strong adoption and utilization of our Renuvion technology in the cosmetic surgery market, particularly in the U.S., where sales increased more than 100% year-over-year."

Mr. Goodwin continued: "I am very proud of the great year that 2021 was for Apyx Medical Corporation, made possible by the hard work of our team members. ***We delivered Advanced Energy sales growth in excess of 90% in 2021 – impressive growth given the challenging operating environment this year – along with notable operational progress to advance our long-term growth strategy. The impressive demand we have seen for our innovative Helium Plasma Technology reaffirms our conviction in the compelling long-term opportunity that remains ahead.*** We look forward to continuing our pace of commercial traction and execution in the years to come for the benefit of both our customers and our shareholders."

48.    Defendants' statements in ¶47 above were materially false and misleading.  As Apyx admitted in its May 12, 2022 conference call, the Company received feedback from the FDA requesting changes to Apyx's messaging on its website, labeling, and training materials with respect to the off-label use of its products.  The Company admitted further that the FDA

requested stronger statements in Apyx's labeling to warn of any specific procedure intended to improve the appearance of skin which had not yet been reviewed or cleared by the agency. Additionally, Apyx admitted that the FDA also requested the Company to remove instances of language or imagery that might imply intended use outside of the cleared general indications. Thus, Defendants failed to disclose that they were aware that the growth in the Company's products, including Renuvion and J-Plasma, was artificially inflated by off-label use, and that the risk posed by such use through FDA regulation severely impacted the Company's financial condition. Defendants also failed to disclose that the Company's purported risk disclosures were materially false and misleading because the purported risks had already materialized and were greater in magnitude than Defendants portrayed.

49.    The accounts of former employees further demonstrate the false and misleading nature of Defendants' statements. CW1 served as a Senior Surgical Device Specialist at Apyx from October 2018 to January 2020. During CW1's tenure, CW1 learned that physicians frequently used the Company's products without receiving proper training. CW1 also stated that physicians used Renuvion for dermal resurfacing, which CW1 described as problematic. CW1 had conversations about CW1's concerns with CW1's former manager, Van Skike, as well as other colleagues, including Jeff Kirchman and Sabrina Janeka, a sales specialist in Texas. CW1 stated that

25

when CW1 raised concerns to Van Skike, the response CW1 received was "nothing helpful" because "it was all about the numbers." CW1 stated further that people were asking about off-label uses of the Company's products "all the time" and that many of the Company's representatives would view such inquiries as sales opportunities. CW1 stated that several members of Apyx's clinical team would discuss other territories where representatives would promote off-label use or would train people, which CW1 also described as problematic.

50.    Additionally, CW2 served as an Associate Sales Representative at Apyx from August 2019 to November 2020. CW2 stated that the Company's sales representatives used DocMatter to monitor the use of the Company's products. According to CW2, during CW2's tenure, there were numerous conversations on DocMatter regarding the use of Renuvion for dermal resurfacing. CW2 stated that Apyx worked with the DocMatter team, and that once physicians purchased the device, they received an invitation from DocMatter. According to CW2, the Company's salespeople viewed DocMatter as a great sales tool, and the Company was aware that physicians posted on DocMatter regarding numerous instances using Renuvion for dermal resurfacing.

51.    On March 14, 2022, Apyx issued a press release disclosing that the FDA would be posting a MDSC related to the Company's Advanced Energy Products.  The press release stated:

**CLEARWATER, FL — March 14, 2022 – Apyx® Medical Corporation (NASDAQ:APYX)** (the "Company"), a maker of medical devices and supplies and the developer of Helium Plasma Technology, marketed and sold as Renuvion® in the cosmetic surgery market and J-Plasma® in the hospital surgical market, today announced it has been notified by the U.S. Food and Drug Administration ("FDA"; "Agency") that the Agency intends to post a Medical Device Safety Communication related to the Company's Advanced Energy products.

The FDA posts a Medical Device Safety Communication ("MDSC") to provide public information about an emerging signal, and it is intended to give health care providers, patients, and consumers access to the most current information about a device that may help inform their patient management decision making. A MDSC typically includes a summary of the safety concern, recommendations for patients and caregivers, any additional recommendations for health care providers or manufacturers, and any actions FDA intends to take to resolve the safety concern.

*"Based on our initial interactions with the FDA, we believe the Agency's MDSC will pertain to the use of our Advanced Energy products outside of their FDA-cleared indication for general use in cutting, coagulation, and ablation of soft tissue during open and laparoscopic surgical procedures,"* said Charlie Goodwin, President and Chief Executive Officer. "We support the FDA's focus on ensuring that healthcare providers and patients understand the safe and proper use of our products, as we continue to work towards securing 510(k) clearance for additional indications."

Mr. Goodwin continued: "While *we are aware that some of our products are being used by physicians for dermal resurfacing procedures, for which our products do not have a cleared indication*, we do not and will not promote the use of our products – or train physicians – for these procedures until we receive clearance from the FDA. Our labeling specifically warns against the use of our products for this indication as well. We have been actively engaged with the FDA to obtain 510(k) clearance for an on-label indication and have conducted clinical studies, including our recently published U.S.

27

IDE clinical study focused on dermal resurfacing procedures, to address the need for scientific evidence and necessary information in our labeling."

"Apyx Medical is proud of our commitment to establishing a broad portfolio of clinical support for the safe and effective applications of our technology, our dedication to educating and extensively training our surgeon customers, and our robust post-market surveillance programs to identify, document, and assess adverse events. As a responsible and fully compliant medical device company, Apyx Medical submits a medical device report, or "MDR," to the FDA for our device when the Company receives an adverse event report from a provider or patient that reasonably suggests an Apyx device may have caused or contributed to a serious injury, often before it has been confirmed whether our device caused or contributed to the injury. We submit an MDR even if the event was caused by user error or another device was also identified as a possible cause in the report. With this in mind, Apyx Medical has submitted 90 MDRs involving the use of our Advanced Energy products for subdermal coagulation since the beginning of 2017, representing approximately 0.06% of the more than 150,000 procedures that have been performed globally with our Advanced Energy products over this period. We believe the FDA's decision to post the MDSC is due in part to the increase in MDRs reported in 2021 to 32, as compared to 15 in 2020. During this period, the number of subdermal coagulation procedures performed with our Advanced Energy products more than doubled. We responsibly and conservatively report adverse events and will continue to work with the FDA to ensure safe and effective use of our products by providers and healthy outcomes for their patients."

"To be clear, our Advanced Energy products remain on the market, they continue to retain their existing FDA 510(k) clearances, and we intend to continue marketing and selling our products for their existing clinical indications. We also look forward to continuing to engage with the FDA in support of our two pending 510(k) premarket notifications, which remain under review by the Agency. As a reminder, these two pending 510(k) premarket notifications are intended to obtain a general indication for use of the Renuvion Dermal handpiece in dermatological procedures requiring ablation and resurfacing of the skin, and a specific clinical indication for treating wrinkles and rhytids, pursuant to our regulatory focus on the dermal resurfacing procedure category. Clearances for these indications will allow for training of all new users through Apyx Medical's nursing staff and communication of recommended treatment parameters,

28

warnings, and precautions through product labeling. Additionally, we are committed to submitting a third 510(k) premarket notification by the end of March, which will be supported by data from our U.S. IDE clinical study evaluating the use of Renuvion technology in skin laxity procedures in the neck and submental region."

52.    On this news, the Company's stock fell $4.02, or 40.6%, to close at

$5.88 per share on March 14, 2022, on unusually heavy trading volume.

## POST CLASS PERIOD EVENTS

53.    On March 17, 2022, Apyx held a conference call in connection

with its fourth quarter and full year 2021 financial results. During the call,

Defendant Goodwin stated:

In 2021, we continue to advance our U.S. regulatory strategy to secure clinical indications for our 2 targeted procedure categories in the U.S. Specifically, we submitted a 510(k) for a specific clinical indication, the clearance of which will enable us to market and sell Renuvion for the use in dermal resurfacing procedures. And we completed enrollment in the IDE study intended to support our pursuit of an indication for the use of Renuvion in skin laxity procedures. Internationally, we secured registrations to sell our Advanced Energy products in 10 new countries, including 2 countries in the fourth quarter.

In terms of clinical evidence generation, the portfolio of clinical evidence for our Renuvion technology continued to expand. In 2021, we saw 7 new peer-reviewed clinical articles published in journals, such as the American Journal of Cosmetic Surgery, the Journal of Cosmetic Dermatology and the Journal of Aesthetic & Reconstructive Surgery. These publications further strengthen the compelling body of evidence that we have established for our technology over the last 4 years, which includes a total of 38 clinical publications.

Our physician and practice support efforts in 2021 resulted in the development of 14 physician mentor programs for nearly 600 attendees, and our first multi-day users meeting featuring informative presentations from our top surgeon users. We also hosted 13 educational training sessions for our international distributors as well as multiple KOL podium presentations at academic conferences and

29

trade shows. And lastly, from a manufacturing initiative standpoint, we improved our existing handpiece production capabilities and began manufacturing handpieces at our Bulgarian facility enabling us to nearly double our existing handpiece manufacturing capacity. We also continue to introduce our APR handpiece to our existing international markets, driving improvements in our overall handpiece gross margins.

Stepping back for a moment, since 2018, these 4 strategic initiatives have been our primary focus as we endeavor to enhance the company's foundation to support a sustainable long-term growth in the cosmetic surgery market. Over the last 4 years, we have built a solid foundation for future growth, and we look forward to capitalizing on the benefits of our multiyear progress towards these strategic initiatives in '22 and beyond. Before turning it over to Tara for a discussion of our financials and guidance, I'd like to provide some context on the recent FDA safety announcement made this past Monday. I'll begin with some background information on our safety reporting and compliance program as a medical device manufacturer.

As part of our program, we routinely submit medical device reports, or MDRs, in order to report serious adverse events to the FDA. These MDRs are submitted when we receive an adverse event report that reasonably suggests one of our devices may have caused or contributed to a serious injury. These MDRs are often submitted before it is confirmed that our device caused or contributed the injury. They are also submitted in situations where the event was caused by user err and in situations where another device has been identified as a possible cause. With this backdrop, in February, we were contacted by the FDA. Through MDRs, they were requesting our assistance to complete an evaluation of post-market safety concerns with our Advanced Energy devices.

After clarifying the request with a member of their team, we provided the FDA with data for adverse events, MDRs, promotional items and training for our Advanced Energy products for the requested last 5 years, beginning with 2017. On Friday, March 11, we were informed that they intended to publish a safety communication, which was posted to the FDA website on Monday, March 14. The FDA safety communication warns against the use of our Advanced Energy devices for procedures intended to improve the appearance of skin through dermal resurfacing or skin contraction. As a reminder, our products are cleared for general use in cutting, coagulation and ablation of soft

30

tissue during open and laparoscopic surgical procedures, and we market them in accordance with this indication.

To be clear, all of our Advanced Energy products remain on the market, and we intend to continue marketing and selling them for their existing clinical indications for use, most commonly for subdermal coagulation. Importantly, we do not promote our products in the U.S. for dermal resurfacing or skin contraction and will not do so until we receive clearance from the FDA. Apyx Medical takes the safety of our customers and their patients very seriously. We understand that the FDA's decision to post the safety communication was based on an abundance of caution for patients, and we support the agency's focus on ensuring that clinicians and their patients understand the safe and proper use of our products. ***We believe that the decision to post this safety communication was due in part to the increase in the absolute number of MDRs reported for our Advanced Energy products in 2021 compared to 2020.***

***Specifically, the MDR data that we provided to the FDA team showed that there were 90 MDRs involving the use of our Advanced Energy products for subdermal coagulation since the beginning of 2017, 32 of which occurred in 2021 as compared to 15 MDRs in 2020.*** In terms of the rate of occurrence of these MDRs, our products have been used for subdermal coagulation in over 150,000 procedures globally since 2017, which represents an MDR rate of 0.06%. Importantly, while the 0.06% MDR rate since 2017 is low, the rate of MDRs has declined over this period and represented approximately 0.04% of global procedures in 2021.

Looking more closely at the 32 MDRs reported for subdermal coagulation in 2021, investigation showed the events were either not attributable to the device or the events reported were within the scope of the existing clinical risk included in our product labeling. ***14 of these 32 MDRs were performed by physicians that had not yet been trained by our global clinical team of skilled nursing staff.*** This, for us, underlines the importance of our continued outreach to all of our customers and that all surgeons receive our training and fully adhere to our safe and effective use guidelines, which were designed by our Medical Advisory Board to further ensure patient safety.

Based on our latest interaction last Friday, it is our understanding that the FDA's post market team had not completed their review of the MDR data that we provided in response to their February request. The FDA has accepted our request for a meeting with the post-market

team, and we look forward to working with them to provide any needed assistance as they complete their review. Following our press release Monday morning, our team has engaged with the majority of our top users in the U.S. and distributor partners outside the U.S. to answer questions related to the safety communication. Apyx Medical is proud of our commitment to product safety, patient safety, surgeon education and training and customer support.

Based on the feedback we have gathered this week, we believe that any potential disruption related to the FDA safety communication will be transitory. And we will continue to evaluate what effects, if any, the FDA safety communication will have on our business and results of operations. We continue to believe in the long-term outlook for Apyx Medical remains compelling. Looking ahead, we will continue to support our customers while working with the FDA to address any questions about the post-market safety profile of our products. As I will discuss later in my remarks, we will also look forward to continuing to engage with the FDA in support of our pending 510(k) premarket notifications, which remain under review.

54.    On May 12, 2022, Apyx held a conference call in connection with its first quarter 2022 financial results. During the call, Defendant Goodwin stated that, following a meeting with FDA's post-market team, Apyx received feedback from the FDA with requested revisions, including changes to certain messaging on the Company's website, labeling, and training materials:

Within our Advanced Energy business, strong global handpiece demand was by far the largest contributor to our year-over-year growth in Q1, with handpiece sales increasing by more than 80% year over year. We were also pleased to see that handpiece sales growth was driven by strong sales in both U.S. and international customers. As a reminder, our handpiece sales growth is an important indicator of the utilization that we are seeing from our existing surgeon customers, reflecting the underlying demand for our Helium Plasma Technology.

With respect to our Advanced Energy generator sales, our performance during the first quarter was more modest. Generator sales increased 2% year over year, with strong growth in sales to our international customers, moderated by year-over-year decline in sales to U.S.-based surgeon customers. As we had anticipated, sales of our Advanced

Energy generators to new customers, particularly in the U.S., were significantly challenged by the disruption following the safety communication posted to the FDA website on March 14th.

The FDA's safety communication warned against the use of our Advanced Energy devices for specific intended to improve the appearance of skin through dermal resurfacing or skin contraction. As a reminder, our products are cleared for general use in cutting, coagulation, and ablation of soft tissue during open and laparoscopic surgical procedures, and we market them in accordance with this indication. To be clear, our Advanced Energy products remain on the market with their existing FDA 510(k) clearances, and we continue to market and sell them for their existing clinical indications, while advancing our regulatory strategy to pursue clearance for new specific indications related to our target procedures.

With that context as a backdrop, let me take a minute to review the recent developments related to the FDA safety communication and provide you with an update on our progress since our Q4 earnings call. Remember, as required by FDA regulation, we routinely submit to FDA medical device reports, or MDRs, for serious adverse events reported to Apyx. We submit MDRs when we receive an adverse event report that reasonably suggests that one of our devices may have caused or contributed to a serious injury. We submit an MDR, even if the event may have been caused by user error or if another device was also identified as a possible cause in the report.

As we discussed on our fourth quarter earnings call in March, we believe that the FDA's decision to post this safety communication was due, in part, to the increase in the absolute number of MDRs for our Advanced Energy products in 2021 compared to 2020, with 32 MDRs involving the use of our Advanced Energy products for subdermal coagulation in 2021, compared to 15 in 2020. Our products have been used for subdermal coagulation in over 150,000 procedures globally since 2017, which represents an MDR rate of 0.06%. In 2021, this rate declined, representing approximately 0.04% of global procedures.

In addition, our investigation of the 32 MDRs reported for subdermal coagulation in 2021 showed that the events were either not attributable to our Advanced Energy device, or were within the scope of the existing clinical risks included in our product labeling. Importantly, 14 of these 32 MDRs were performed by physicians that had not yet been trained by our global clinical team of skilled nursing staff.

33

In February, we provided the FDA's post-market team with data related to our adverse events, MDRs, promotional items, and training for our Advanced Energy products. In our communication with the FDA on March 11, when we were notified about the intention to post the safety communication, it was our understanding that the FDA post-market team had not completed their review of this data. Following the FDA's safety communication, we requested a meeting with the FDA's post-market team to discuss the safety communication and our MDR data. I'm pleased to report that this meeting was held on March 29.

During the meeting, our regulatory and clinical team presented a detailed analysis of our MDR data to clarify the reported adverse events and provide important context. ***On April 1, we received feedback from the FDA with requested revisions, including changes to certain messaging on our website, labeling, and training materials.*** The requested revisions reaffirmed our belief that the FDA is focused on the use by surgeons of our Advanced Energy products outside the general indications for use for which they are currently cleared. Surgeons may lawfully do so, but ***the FDA has requested stronger statements in our labeling to warn of any specific procedure intended to improve the appearance of skin which has not yet been reviewed or cleared by the agency. The FDA also asked us to remove instances of language or imagery that might imply intended use outside of the cleared general indications.*** We submitted our response to the FDA and have incorporated the requested revisions.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the Company's securities during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and

their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

56.    The members of the Class are so numerous that joinder of all members is impracticable.    Throughout the Class Period, the Company's securities were actively traded on NASDAQ.    While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.    Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.    Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

58.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

59.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual

members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts constituted violations of the federal securities laws;

(b)     whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c)     whether the price of the Company's securities was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  Additionally, there will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

61.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially

36

inflated the price of the Company's securities. Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's securities by failing to disclose, and misrepresenting, the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's securities declined significantly as the prior artificial inflation dissipated from the price of the Company's securities.

62. As a result of the purchases of the Company's securities during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws. Defendants' false and misleading statements had the intended effect, and caused, the Company's securities to trade at artificially inflated levels throughout the Class Period.

63. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects. As the truth regarding the Company was revealed to the market, the price of the Company's securities fell significantly. These declines removed the inflation from the price of the Company's securities, causing real economic loss to investors who purchased the Company's securities during the Class Period.

64.     The declines in the price of the Company's securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.   The timing and magnitude of the price declines in the Company's securities negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to defendants' fraudulent conduct.

65.     The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:

## FRAUD ON THE MARKET DOCTRINE

66.     At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a)     The Company's securities met the requirements for listing, and were listed and actively traded on, NASDAQ, a highly efficient, electronic stock market;

38

(b)    As a regulated issuer, the Company filed periodic public reports with the SEC and NASDAQ;

(c)    The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

67.    As a result of the foregoing, the market for the Company's securities promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's securities. Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

68.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly

false statements alleged herein.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision. Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

69.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

70.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading.  These

statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.    Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

72.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

73.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
## Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

74.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

75.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

76.    The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein.  The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected.  Additionally, the

42

Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

77.    The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

78.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 13, 2022          Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Ex Kano S. Sams II*
Ex Kano S. Sams II (*pro hac vice*)
Casey E. Sadler (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: csadler@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz (*pro hac vice*)
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

**DESMOND LAW FIRM, P.C.**
Leo W. Desmond, Esq.
Florida Bar Number 0041920
601 21st Street, Suite 300
Vero Beach, Florida 32960
Telephone: 772.231.9600
Email: lwd@desmondlawfirm.com

*Attorneys for Plaintiff William E. Hattaway*

44

CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2022 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

/s/ Ex Kano S. Sams II
*Attorney for Lead Plaintiff*
*William E. Hattaway*