# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| WILLIAM E. HATTAWAY, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>   v.<br><br>APYX MEDICAL CORPORATION, CHARLES D. GOODWIN II, and TARA SEMB,<br><br>        Defendants | Case No. 8:22-cv-01298-WFJ-SPF |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................... 1

II.    STATEMENT OF FACTS ...................................................................... 2

III.   STANDARD OF REVIEW ..................................................................... 5

IV.  PLAINTIFF ADEQUATELY ALLEGE VIOLATIONS OF THE
EXCHANGE ACT.................................................................................. 6

     A.    Plaintiff Adequately Allege that Defendants Made Materially False
and Misleading Statements ......................................................... 6

          1.    Defendants' Representations Regarding the Company's First
Quarter 2021 Results ................................................. 7

          2.    Defendants' Representations Regarding the Company's Second
Quarter 2021 Results ................................................. 8

          3.    Defendants' Representations Regarding the Company's Third
Quarter 2021 Results ................................................. 9

          4.    Defendants' Representations Regarding the Company's Fourth
Quarter 2021 and Full Year 2021 Results .............................. 10

          5.    Plaintiff Adequately Alleges the Reasons Why Defendants'
Statements Were False and Misleading .................................. 11

          6.    Defendants' Falsity Arguments Fail ....................................... 14

     B.    Plaintiff Adequately Alleges that Defendants Acted With Scienter .. 20

          1.    Defendants' Admissions Support a Strong Inference of
Scienter .............................................................. 21

2. The Confidential Witnesses Add to the Strong Inference of Scienter Alleged ...................................................................... 21

3. Because the Facts Alleged Relate to the Company's Core Operations, They Support a Strong Inference of Scienter....... 22

C. Plaintiff Adequately Alleges Loss Causation ................................... 24

D. Plaintiff Adequately Alleges Control Person Liability...................... 25

V. CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)....................................................................... 19, 21

*Anastasio v. Internap Network Servs.*,
2010 WL 11459838 (N.D. Ga. Sept. 15, 2010) .................................................. 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................... 6

*Asher v. Baxter, Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004)............................................................................. 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................... 5

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) ....................................................................... 14

*Bryant v. Dupree*,
252 F.3d 1161 (11th Cir. 2001)......................................................................... 25

*City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l*,
806 F. Supp. 2d 1267 (N.D. Ga. 2011) ............................................................ 14

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..................................................................................... 24, 25

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014)........................................................................... 20

*Einhorn v. Axogen*,
42 F.4th 1218 (11th Cir. 2022) ....................................................................... 18

*FindWhat Inv'r Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011)............................................................... *passim*

*In re 2007 Novastar Fin. Sec. Litig.*,
  579 F.3d 878 (8th Cir. 2009) ............................................................. 14

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ........................................................... 12, 18

*In re Columbia Labs. Sec. Litig.*,
  144 F. Supp. 2d 1362 (S.D. Fla. 2001) ............................................. 18

*In re First Merchants Acceptance Corp. Sec. Litig.*,
  1998 WL 781118 (N.D. Ill. Nov. 4, 1998) ........................................ 19

*In re Flowers Foods, Inc. Sec. Litig.*,
  2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ....................... 16, 22, 23

*In re HD Supply Holdings, Inc. Sec. Litig.*,
  341 F. Supp. 3d 1342 (N.D. Ga. 2018) ......................... 16, 19, 22, 24

*In re Netbank, Inc. Sec. Litig.*,
  2009 WL 2432359 (N.D. Ga. Jan. 29, 2009) ..................................... 22

*In re Read-Rite Corp. Sec. Litig.*,
  335 F.3d 843 (9th Cir. 2003) ............................................................. 11

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) .............................................................. 17

*Karinski v. Stamps.com, Inc.*,
  2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ..................................... 14

*Keippel v. Health Ins. Innovations, Inc.*,
  2019 WL 5698329 (M.D. Fla. Nov. 4, 2019) ............................. *passim*

*Lloyd v. CVB Fin. Corp.*,
  2016 WL 384773 (9th Cir. Feb. 1, 2016) .......................................... 22

*Luczak v. Nat'l Beverage Corp.*,
  812 F. App'x 915 (11th Cir. 2020) ....................................... 17, 21, 25

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ............................................................ 23

*Meide v. Pulse Evolution*,
  2020 WL 5350325 (M.D. Fla. Sept. 4, 2020) ................................. 14

*Mogensen v. Body Cent.*,
  15 F. Supp. 3d 1191 (M.D. Fla. 2014) ...................................... 18

*Primavera Invs. v. Liquidmetal Techs., Inc.*,
  403 F. Supp. 2d 1151 (M.D. Fla. 2005) ..................................... 18

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*,
  111 F. Supp. 3d 1336 (S.D. Fla. 2015) ..................................... 22

*S.E.C. v. Morgan Keegan & Co.*,
  678 F.3d 1233 (11th Cir. 2012).............................................. 6

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016)............................................... 21

*SEC v. Kingdom Legacy Gen. Partner, LLC*,
  2017 WL 417093 (M.D. Fla. Jan. 31, 2017) ................................. 14

*SEC v. Merchant Capital, LLC*,
  483 F.3d 747 (11th Cir. 2007).............................................. 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................... 6, 20, 23

*TSC Indus. v. Northway, Inc.*,
  426 U.S. 438 (1976) ....................................................... 16

## **STATUTES**

15 U.S.C. §78u-4 .................................................... 6, 20, 24

15 U.S.C. §78u–5 .......................................................... 18

## I.  INTRODUCTION

This is a securities class action on behalf of all persons and/or entities who purchased or acquired the securities of Apyx Medical Corporation ("Apyx" or the "Company") between May 12, 2021 and March 11, 2022, inclusive ("Class Period"). Apyx claims to be an advanced energy technology company with products in the cosmetic and surgical markets. Nearly 80% of its revenue is derived from the Advanced Energy segment, which consists of the Company's helium plasma technology that is marketed and sold as Renuvion (in the cosmetic surgery market) and J-Plasma (in the hospital surgical market).

On March 14, 2022, Apyx disclosed that the U.S. Food and Drug Administration ("FDA") would be posting a Medical Device Safety Communication ("MDSC") related to the Company's Advanced Energy Products. The Company further disclosed that "[b]ased on our initial interactions with the FDA, we believe the Agency's MDSC will pertain to the use of our Advanced Energy products outside of their FDA-cleared indication for general use in cutting, coagulation, and ablation of soft tissue during open and laparoscopic surgical procedures." Specifically, the FDA warned that physicians should stop using certain Apyx medical devices to treat skin wrinkles after receiving multiple reports involving severe burns, nerve damage, and other potentially life-threatening injuries. The FDA's warning indicated that the devices had not been approved for aesthetic

skincare procedures and urged doctors to stop using them for such purposes immediately to avoid causing serious harm to patients. On this news, the Company's stock fell 41%, causing significant losses for investors.

Plaintiff brings this action pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder on behalf of himself and all others similarly situated. Plaintiff's Complaint demonstrates that Defendants failed to disclose that a significant number of Apyx's Advanced Energy products were used for off-label indications, and that such off-label uses led to an increase in the number of medical device reports filed by Apyx reporting serious adverse events. As a result of Defendants' misrepresentations and omissions, the Company faced increased regulatory scrutiny that adversely impacted the Company's financial results. Because Plaintiff has adequately alleged claims under the Exchange Act, the Court should deny Defendants' Motion to Dismiss Plaintiff's Amended Class Action Complaint and Memorandum of Law ("Motion").

## II.    STATEMENT OF FACTS

Apyx claims to be an advanced energy technology company with several products, including its Helium Plasma Technology products marketed and sold as Renuvion in the cosmetic surgery market and J-Plasma in the hospital surgical market. ¶23. Apyx claims that Renuvion and J-Plasma offer surgeons a unique

ability to provide controlled heat to tissue to achieve their desired results. *Id*. The Company also claims to leverage its expertise and experience in unique waveforms through agreements with other medical device manufacturers. *Id*.

As part of its plan to accelerate and fully fund the development of its advanced energy business, with a focus in the cosmetic surgery market, the Company sold its Core business in 2018 for gross proceeds of $97 million. ¶24. These proceeds were used to launch broad marketing and sales initiatives which resulted in rapid sales growth through December 31, 2021 and into the first quarter of 2022. *Id*. This planned growth in the business was accompanied by scaled operations, including procurement of components, expanded manufacturing capacity to turn those materials into saleable inventory, additional discretionary expenditures, including increased global participation at trade shows, additional employee trainings, user meetings, increased travel and entertainment expenses, more expansive research and development projects, and additional headcount to support those activities. *Id*. Additionally, the Company had significant non-recurring discretionary expenditures associated with completing its multi-year marketing initiatives related to its dermal resurfacing and skin laxity clearances. *Id*.

Apyx's Renuvion and J-Plasma systems use radiofrequency energy and helium to generate plasma, which is used to cut, coagulate, and eliminate soft tissue with heat during general surgical procedures. ¶25. While the devices were cleared

by the FDA for use during open and laparoscopic procedures, the FDA became aware of multiple reported injuries arising from healthcare providers using these devices during cosmetic skin procedures. *Id*.

On March 14, 2022, the FDA posted a Safety Communication that warned consumers and health care providers against the use of the Company's Advanced Energy products outside of their FDA-cleared indications for general use in cutting, coagulation, and ablation of soft tissue during open and laparoscopic surgical procedures. ¶¶26, 51. According to the warning, the FDA received multiple reports indicating patients who underwent aesthetic skin care procedures using the Renuvion and J-Plasma devices suffered serious and potentially life-threatening adverse events. *Id*. Injuries from the Renuvion and J-Plasma devices included second- and third- degree burns, infection, change in skin color, scars, nerve damage, significant bleeding, and air or gas accumulation under the skin, in body cavities, and in blood vessels. ¶27. The FDA also become aware of incidents in which injuries caused by Renuvion and J-Plasma required treatment in an intensive care unit. *Id*.; ¶51.

Defendants also admitted that "we are aware that some of our products are being used by physicians for dermal resurfacing procedures, for which our products do not have a cleared indication . . . ." *Id*. Following the FDA's Safety Communication, the Company's stock fell 41%. ¶52. The Company also experienced slowed demand for the adoption of its Helium Plasma Technology. ¶28.

On March 17, 2022, Apyx held a conference call in connection with its fourth quarter and full year 2021 financial results. ¶53. During the call, Goodwin stated: (1) "[w]e believe that the decision to post this safety communication was due in part to the increase in the absolute number of MDRs reported for our Advanced Energy products in 2021 compared to 2020; (2) the MDR data that we provided to the FDA team showed that there were 90 MDRs involving the use of our Advanced Energy products for subdermal coagulation since the beginning of 2017, 32 of which occurred in 2021 as compared to 15 MDRs in 2020; and (3) "[l]ooking more closely at the 32 MDRs reported for subdermal coagulation in 2021, investigation showed the events were either not attributable to the device or the events reported were within the scope of the existing clinical risk included in our product labeling. 14 of these 32 MDRs were performed by physicians that had not yet been trained by our global clinical team of skilled nursing staff. *Id*.

On May 12, 2022, Apyx held a conference call in connection with its first quarter 2022 financial results. ¶54. During the call, Defendant Goodwin stated that, following a meeting with FDA's post-market team, Apyx received feedback from the FDA with requested revisions, including changes to certain messaging on the Company's website, labeling, and training materials. *Id*.

## III.   STANDARD OF REVIEW

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety. . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Courts must also construe the alleged facts in the light most favorable to the plaintiff. *Keippel v. Health Ins. Innovations, Inc.*, No. 8:19-CV-421-02CPT, 2019 WL 5698329, at *6 (M.D. Fla. Nov. 4, 2019).

## IV. PLAINTIFF ADEQUATELY ALLEGE VIOLATIONS OF THE EXCHANGE ACT

### A. Plaintiff Adequately Allege that Defendants Made Materially False and Misleading Statements

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). A misrepresentation or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012).[1] Additionally, "[b]y voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not so incomplete as to mislead." *FindWhat Inv'r*

---

[1] Unless otherwise indicated, all emphasis is added and all internal quotations and citations are omitted.

*Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011).

**1.      Defendants' Representations Regarding the Company's First Quarter 2021 Results**

On May 12, 2021, Apyx announced its financial results for 1Q21, stating, among other things, that "we continued to see healthy utilization of our Helium Plasma Technology in the U.S. and key international markets, resulting in total handpiece growth in excess of 100% year-over-year." ¶29.  Also on May 12, 2021, the Company filed its Form 10-Q for 1Q21.  ¶30.  The Form 10-Q incorporated by reference the risk factors stated in Apyx's fiscal 2020 annual report ("2020 10-K").  *Id*.  In relevant part, the 2020 10-K stated:

> If the FDA were to conclude that we are not in compliance with applicable laws or regulations, or that any of our medical products are ineffective or pose an unreasonable health risk, they could ban such medical products, seize adulterated or misbranded medical products, order a recall, repair, replacement, correction, or refund of such products, refuse to grant pending pre-market approval applications, refuse to issue export certificates for foreign governments, or require us to notify health professionals and others that the devices present unreasonable risks of substantial harm to the public health.

> * * *

> In addition, the FDA has taken the position that device manufacturers are prohibited from promoting their products other than for the uses and indications set forth in the cleared product labeling. Any failure to comply could subject us to significant civil or criminal exposure, administrative obligations and costs, other potential penalties from, and/or agreements with, the federal government. Governmental regulations worldwide have, and may continue to become, increasingly stringent and customary.

> *Id*.

On May 12, 2021, Apyx also held an earnings call to discuss the Company's financial results for 1Q21. ¶31. During the call, CEO Goodwin stated that "[t]he year-over-year increase in total revenue was driven exclusively by our sales of our Advanced Energy Products, which increased 92% year-over-year to $7.7 million, more than offsetting a modest decline in our OEM business, which decreased 3% year-over-year to $1 million." *Id*.

### 2. Defendants' Representations Regarding the Company's Second Quarter 2021 Results

On August 12, 2021, Apyx announced its financial results for 2Q21. ¶35. Within the press release, Defendants stated the following:

> We are pleased to deliver exceptional growth in sales of our Advanced Energy products which exceeded our expectations for the second quarter, reflecting solid execution by our team and continued improvement in the broader operating environment," said Charlie Goodwin, President and Chief Executive Officer. "Most notably, we saw impressive growth in global sales of our Advanced Energy handpieces, which increased by over 270% year-over-year, driven by utilization-based demand both domestically and internationally. We were also pleased to see important contributions from global sales of our generators, which increased by more than 210% year-over-year, reflecting strong adoption of our technology in the U.S. and key international markets as the capital equipment environment continued to recover.

> *Id*.

Also on August 12, 2021, the Company filed its Form 10-Q for 2Q21. ¶36. The Form 10-Q incorporated by reference the risk factors stated in Apyx's 2020 10-K. ¶¶30, 36. Additionally, on August 12, 2021, Apyx held an earnings call to

discuss the Company's financial results for 2Q21. ¶37. During the call, Defendant

Goodwin stated the following:

> We delivered second quarter growth in each of our segments that exceeded the expectations we outlined on our Q1 call. The performance in our Advanced Energy business showed particularly impressive strength with growth nearly 70 percentage points above the high end of our guidance expectations. We believe our second quarter sales performance reflected the solid execution of our team and the continued improvement in the broader operating environment, which enabled us to achieve better-than-expected sales results, both in the U.S. and internationally.

> * * *

> We saw notable improvements across all aspects of our Advanced Energy business in the second quarter of 2021 compared to the second quarter of 2019 as well, with advanced energy sales up 87% over quarter 2 of '19.

### 3. Defendants' Representations Regarding the Company's Third Quarter 2021 Results

On November 11, 2021, Apyx issued a press release announcing its financial

results for 3Q21. ¶41. Within the press release, the Company stated the following:

> "We are excited by our team's impressive execution during the third quarter, which enabled us to achieve 88% growth year-over- year in sales of our Advanced Energy products. Our Advanced Energy sales growth was driven primarily by strong, global utilization of our Advanced Energy handpieces, with global handpiece sales increasing more than 100% year-over-year. We also saw global Advanced Energy generator sales increase by more than 70% year-over-year, primarily reflecting healthy adoption of our Renuvion technology in the U.S. cosmetic surgery market."

> *Id*.

Also on November 11, 2021, the Company filed its Form 10-Q for 3Q21. ¶42.

The Form 10- Q incorporated by reference the risk factors stated in Apyx's 2020 10-

K. ¶¶30, 42.  On November 11, 2021, Apyx also held an earnings call to discuss the

Company's financial results for 3Q21.  ¶42.  During the call, Defendant Goodwin

stated the following:

> Looking at the results in our Advanced Energy segment. Our Advanced Energy sales growth exceeded our expectations for the quarter, driven primarily by strong growth in global sales of our handpieces, along with demand for our generators in the U.S. Global sales of our handpieces increased more than 100% year-over-year. We were pleased to see that this growth was diversified with strong contributions from sales to both our U.S. customers and international distributors, reflecting strong utilization-based demand for our global customer base. The greater than 100% increase in global handpiece sales in Q3 was especially notable given the emergence of the Delta variant during the third quarter and the return of the typical seasonality that we experience each year as surgeons tend to take vacations in the latter months of summer.

> *Id*.

### 4. Defendants' Representations Regarding the Company's Fourth Quarter 2021 and Full Year 2021 Results

On January 10, 2022, Apyx announced its preliminary fourth quarter and full

year 2021 financial results.  ¶47.  Within the press release, the Company stated the

following:

> Mr. Goodwin continued: "I am very proud of the great year that 2021 was for Apyx Medical Corporation, made possible by the hard work of our team members. ***We delivered Advanced Energy sales growth in excess of 90% in 2021 – impressive growth given the challenging operating environment this year – along with notable operational progress to advance our long-term growth strategy. The impressive demand we have seen for our innovative Helium Plasma Technology reaffirms our conviction in the compelling long-term opportunity that remains ahead.***

> *Id*.

**5. Plaintiff Adequately Alleges the Reasons Why Defendants' Statements Were False and Misleading**

Plaintiff alleges with specificity the reasons why Defendants' statements were materially false and misleading. ¶¶32, 38, 44, 48, 54. As Apyx admitted in its May 12, 2022 conference call, the Company received feedback from the FDA requesting changes to Apyx's messaging on its website, labeling, and training materials with respect to the off-label use of its products. *Id*. The Company admitted further that the FDA requested stronger statements in Apyx's labeling to warn of any specific procedure intended to improve the appearance of skin which had not yet been reviewed or cleared by the agency. *Id*. Additionally, Apyx admitted that the FDA also requested the Company to remove instances of language or imagery that might imply intended use outside of the cleared general indications. *Id*. A "later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Read-Rite Corp. Sec. Litig*., 335 F.3d 843, 846 (9th Cir. 2003).

Defendants also failed to disclose that the Company's purported risk disclosures were materially false and misleading because the purported risks had already materialized and were greater in magnitude than Defendants portrayed. ¶¶32, 38, 44, 48, 54. "[T]o warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *FindWhat*, 658 F.3d at 1299.

11

Indeed, "[r]isk disclosures that speak[ ] entirely of as-yet-unrealized risks and contingencies and do not alert[ ] the reader that some of these risks may already have come to fruition can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021); *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 769 (11th Cir. 2007) (same). Here, Defendants failed to disclose that they were aware that the growth in the Company's products, including Renuvion and J-Plasma, was artificially inflated by off-label use, and that the risk posed by such use through FDA regulation severely impacted the Company's financial condition. ¶¶32, 38, 44, 48, 54. These facts further demonstrate falsity.[2]

The accounts of former employees also illustrate the false and misleading nature of Defendants' statements. ¶¶33, 39, 45, 49. CW1 served as a Senior Surgical Device Specialist at Apyx from October 2018 to January 2020. *Id*. During CW1's tenure, CW1 learned that physicians frequently used the Company's products without receiving proper training. *Id*. CW1 also stated that physicians used Renuvion for dermal resurfacing, which CW1 described as problematic. *Id*. CW1 had conversations about CW1's concerns with CW1's former manager, Stephanie Van Skike ("Van Skike"), the Western United States Senior Regional Director, as

---

[2]     Defendants attempt to refute that the risk alleged had already transpired by focusing upon the MDSC and the FDA's request (Motion at 19) while ignoring allegations regarding Defendants' admissions demonstrating their knowledge of the risk long before the MDSC and the FDA's request, including, but not limited to, the Company's submissions of MDRs before and during the Class Period and Defendants' knowledge that physicians were using the Company's products without proper training. *See, e.g.*, ¶¶53-54.

well as other colleagues, including Jeff Kirchman and Sabrina Janeka, a sales specialist in Texas. *Id*. CW1 stated that when CW1 raised concerns to Van Skike, the response CW1 received was "nothing helpful" because "it was all about the numbers." *Id*. CW1 stated further that people were asking about off-label uses of the Company's products "all the time" and that many of the Company's representatives would view such inquiries as sales opportunities. *Id*. CW1 stated that several members of Apyx's clinical team would discuss other territories where representatives would promote off-label use or would train people, which CW1 also described as problematic. *Id*.

Additionally, CW2 served as an Associate Sales Representative at Apyx from August 2019 to November 2020. ¶¶34, 40, 46, 50. CW2 stated that the Company's sales representatives used DocMatter (an internet-enabled and human-supported collaboration flatform built by and for physicians) to monitor the use of the Company's products. *Id*. According to CW2, during CW2's tenure, there were numerous conversations on DocMatter regarding the use of Renuvion for dermal resurfacing. *Id*. CW2 stated that Apyx worked with the DocMatter team, and that once physicians purchased the device, they received an invitation from DocMatter. *Id*. According to CW2, the Company's salespeople viewed DocMatter as a great sales tool, and the Company was aware that physicians posted on DocMatter

regarding numerous instances using Renuvion for dermal resurfacing. *Id*. Thus, these facts demonstrate the false and misleading nature of Defendants' statements.

### 6. Defendants' Falsity Arguments Fail

The arguments that Defendants raise regarding falsity fail. First, Defendants contend that it is "impossible to discern exactly which statements Plaintiff challenges and why" and that Plaintiff's allegations constitute a "puzzle pleading" approach that requires dismissal. Motion at 14-15. However, Plaintiff's complaint "cannot be characterized as a puzzle pleading" because "the Complaint contains sufficiently particularized counts allowing a reader to match up alleged misstatements and omissions with their explanatory counterparts." *SEC v. Kingdom Legacy Gen. Partner, LLC*, No. 216CV441FTM38MRM, 2017 WL 417093, at *4 (M.D. Fla. Jan. 31, 2017). Moreover, "Defendants appear to have been able to identify the alleged misstatements and the reasons why the statements were misleading." *Karinski v. Stamps.com, Inc.*, No. CV 19-1828-MWF (SKX), 2020 WL 281716, at *9 (C.D. Cal. Jan. 17, 2020). Defendants' contention fails.[3]

---

[3] The authorities upon which Defendants attempt to rely are distinguishable because unlike the case here, courts held that plaintiffs had not adequately alleged falsity. *See Meide v. Pulse Evolution*, 2020 WL 5350325, *15 (M.D. Fla. Sept. 4, 2020); *Anastasio v. Internap Network Servs.*, 2010 WL 11459838, *5-7 (N.D. Ga. Sept. 15, 2010); *City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l*, 806 F. Supp. 2d 1267, 1291-94 (N.D. Ga. 2011); *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37-38 (2d Cir. 2012); *In re 2007 Novastar Fin. Sec. Litig.*, 579 F.3d 878, 882-84 (8th Cir. 2009).

Second, Defendants argue that their omissions regarding Renuvion's off-label use, the increase in MDRs, and increased risk of regulatory scrutiny are not actionable. Motion at 17-18. Defendants are incorrect. Although Defendants suggest that "such off-label use was legal," they do not dispute the Company's own statements that "the FDA has taken the position that device manufacturers are prohibited from promoting their products other than for the uses and indications set forth in the cleared product labeling" and that "[a]ny failure to comply could subject us to significant civil or criminal exposure, administrative obligations and costs, other potential penalties from, and/or agreements with, the federal government." ¶30. Moreover, Defendants' suggestion that off-label use was "well-known" constitutes a truth-on-the-market defense that "is available in principle . . . but not at the pleading stage." *Asher v. Baxter, Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004). Additionally, Defendants' reliance upon their risk disclosures (Motion at 18-19) misses the point. As noted above, "to warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *FindWhat*, 658 F.3d at 1299. And as this Court has recognized in a similar situation, Defendants raise "disputes not appropriate on this motion." *Keippel*, 2019 WL 5698329, at *8. Moreover, although Defendants contend that the increase in MDRs was purportedly immaterial (Motion at 18 n.12), "[o]nly if the established omissions are so obviously

15

important to an investor, that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law . . . ." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Such is not the case here, particularly considering the significant 41% stock price decline after Defendants disclosed the adverse information. ¶52.

Third, Defendants' contention that the CW statements do not demonstrate falsity is meritless. Motion at 19-21. Defendants claim that the CW accounts should be afforded "no weight" because the CWs left the company 1.5 years and six months before the Class Period. Motion at 20. Courts, however, have repeatedly rejected this assertion. *See, e.g.*, *In re Flowers Foods, Inc. Sec. Litig.*, No. 7:16-CV-222 (WLS), 2018 WL 1558558, at *15 (M.D. Ga. Mar. 23, 2018) (a witness' "statements are not rendered irrelevant merely because [the witness] was not employed during the Class Period"); *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1354-55 (N.D. Ga. 2018) (holding that pre-class information was relevant in determining the false and misleading nature of defendants' statements). And although Defendants claim that more detail from the CWs is required (Motion at 20-21), they concede that the CW accounts demonstrate that physicians were using Renuvion off-label for dermal resurfacing – the very risk that Plaintiff alleges Defendants concealed which caused a 41% stock price decline once Defendants disclosed the truth. Motion at 20; ¶¶3-5, 51. Although "defendants offer a number

16

of reasons to doubt the credibility of the allegations supported by these confidential witnesses" it "is improper to weigh the evidence in this way on a motion to dismiss." *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 924 (11th Cir. 2020).

Fourth, as shown above and contrary to Defendants' suggestion (Motion at 21-22), Defendants' admissions, in fact, demonstrate falsity.

Fifth, Defendants' puffery arguments fail. Motion at 22. As this Court has declared, "courts recognize that the level of specificity a statement must exhibit to cross the puffery threshold cannot be determined from a bright-line rule" and that "while certain statements might be considered puffery in one context, they may be found actionable in another, especially when defendants know or recklessly disregard facts contradicting their statements." *Keippel*, 2019 WL 5698329, at *7. Such is the case here, where Defendants' representations – such as experiencing "exceptional growth" ¶35, "exceed[ing] the expectations we outlined on our Q1 call" ¶37, and "strong global utilization of our Advanced Energy handpieces" ¶41 – are actionable considering the context in which the statements were made. *Keippel*, 2019 WL 5698329, at *7.

Sixth, Defendants' safe harbor and bespeaks caution arguments fail. "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *In re Vivendi, S.A. Sec. Litig.*,

838 F.3d 223, 247 (2d Cir. 2016).  Here, Defendants' cursory assertion is that the Company's "risk factors provided ample meaningful cautionary language, including detailing the very risks at issue here, related to 'costly and complex' regulatory requirements, ongoing regulatory scrutiny, various potential adverse regulatory action, and the potential impact on Apyx."  Motion at 24.  Defendants, however, fail to address the premise of Plaintiff's allegations – that "[r]isk disclosures that speak[ ] entirely of as-yet-unrealized risks and contingencies and do not alert[ ] the reader that some of these risks may already have come to fruition can mislead reasonable investors." *Alphabet*, 1 F.4th at 703; *FindWhat*, 658 F.3d at 1299.  Additionally, the safe harbor provision and the bespeaks caution doctrine are also inapplicable to Defendants' misstatements of current and historical facts (*FindWhat*, 658 F.3d at 1299), and where, as here, Plaintiff adequately alleges that Defendants had actual knowledge that the statements were false or misleading.  15 U.S.C. §78u–5(c)(1)(B)(i); *Primavera Invs. v. Liquidmetal Techs., Inc.*, 403 F. Supp. 2d 1151, 1159 (M.D. Fla. 2005).[4]

Finally, Defendants' contention regarding Plaintiff's allegations regarding financial performance also fails.  Motion at 15-16.  Defendants argue that Apyx did

---

[4]    Defendants' cases are distinguishable because they neither involve a situation in which the alleged risks had already transpired or involve facts that support a strong inference of scienter. *Einhorn v. Axogen*, 42 F.4th 1218 (11th Cir. 2022); *Mogensen v. Body Cent.*, 15 F. Supp. 3d 1191 (M.D. Fla. 2014); *In re Columbia Labs. Sec. Litig.*, 144 F. Supp. 2d 1362 (S.D. Fla. 2001).

not restate its financial results (Motion at 16) while failing to realize that "the fact that the financial statements for the year in question were not restated does not end [plaintiff's] case when he has otherwise met the pleading requirements of the PSLRA." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002). And as this Court has recognized, "Rule 10b–5 prohibits not only literally false statements, but also any omissions of material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Keippel*, 2019 WL 5698329, at *8.

Moreover, a plaintiff is not required to conduct an audit of the Company's financial statements in order to adequately allege a claim for securities fraud. *See, e.g.*, *HD*, 341 F. Supp. 3d at 1355 (N.D. Ga. 2018) (rejecting defendants' argument that plaintiff's allegations were "conclusory, non-specific, and unsupported" and holding that "any further specificity can be satisfied during discovery"); *In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *8-*9 (N.D. Ill. Nov. 4, 1998) (same). The Company's financial results – in the context of the Complaint's allegations – were misleading because Defendants failed to disclose that a significant number of Apyx's Advanced Energy products were used for off-label indications that led to an increased number of medical device reports, thereby increasing the risk of regulatory scrutiny and adverse financial results. Thus, Plaintiff has adequately alleged falsity.

19

**B.      Plaintiff Adequately Alleges that Defendants Acted With Scienter**

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 314.  "To satisfy the scienter requirement, a complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind, which can be an intent to deceive, manipulate, or defraud or severe recklessness."  *Keippel*, 2019 WL 5698329, at *8.  Importantly, "courts must consider the complaint in its entirety . . . . The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 322-23 (italics in original).

A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324-26.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences" – the inference need only be equally plausible to any non-culpable inference.  *Id.* at 324.  Moreover, "a tie goes to the plaintiffs when there are multiple plausible theories at the pleadings stage of litigation." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).

20

## 1. Defendants' Admissions Support a Strong Inference of Scienter

Defendants' post class period admissions constitute powerful evidence of defendants' scienter. *See, e.g.*, *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 708 (9th Cir. 2016) ("Defendants' own response to the issue contributes to an inference of scienter here."); *Aldridge*, 284 F.3d at 76-83 (subsequent public statements supported "an extremely reasonable inference" that the company had previously engaged in improper conduct). Defendants' admissions, including admissions regarding their knowledge of increased MDRs before and during the Class Period and the lack of training that physicians received (which increased the risk of unsafe procedures and regulatory scrutiny), demonstrate that Defendants failed to disclose that a significant number of Apyx's Advanced Energy products were used for off-label indications and that such off-label uses led to an increase in the number of medical device reports filed by Apyx reporting serious adverse events. ¶¶53-54. Accordingly, these admissions support a strong inference of scienter.

## 2. The Confidential Witnesses Add to the Strong Inference of Scienter Alleged

Confidential witness accounts can support a strong inference of scienter where they are "described with sufficient particularity to establish [the witness's] reliability and personal knowledge" and the statements are "indicative of scienter." *Luczak*, 812 F. App'x at 925. Plaintiff has satisfied this standard. First, as demonstrated

above, the Complaint describes the confidential witnesses on whose statements Plaintiff relies with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. ¶¶33, 34, 39, 40, 45, 46, 49, 50. Second, as also noted above, the statements attributed to the CWs are indicative of scienter. *Id.* Contrary to Defendants' contention (Motion at 20), "the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus." *Lloyd v. CVB Fin. Corp.*, No. 13-56838, 2016 WL 384773, at *6 (9th Cir. Feb. 1, 2016). Thus, the CWs bolster the strong inference of scienter. *HD*, 341 F. Supp. 3d at 1352.

### 3. Because the Facts Alleged Relate to the Company's Core Operations, They Support a Strong Inference of Scienter

The facts alleged also support a strong inference of scienter because they relate to the core operations of the Company. *See, e.g., Flowers Foods*, 2018 WL 1558558, at *14 (holding that because the allegations related to the company's core operations, they supported a strong inference of scienter); *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1360-65 (S.D. Fla. 2015) (same). Here, nearly 80% of the Company's revenue is derived from the Advanced Energy segment. ¶2. Thus, the core inference doctrine further supports a strong inference of scienter. *In re Netbank, Inc. Sec. Litig.*, No. CIV.A.1:07-CV-2298-B, 2009 WL 2432359, at *11-13 (N.D. Ga. Jan. 29, 2009).

Defendants' arguments to the contrary fail. First, Defendants contend that the absence of motive allegations undermines Plaintiff's scienter allegations. Motion at 25. The Supreme Court has repeatedly declared, however, that the "absence of a motive allegation" is "not dispositive." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011); *see also Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal").

Second, Defendants recycle their arguments regarding the accounts of the CWs, but, as noted above, a witness' "statements are not rendered irrelevant merely because [the witness] was not employed during the Class Period." *Flowers Foods*, 2018 WL 1558558, at *15. And "[a]s to Defendants' argument that [the witness] never identified any direct interactions with the individual Defendants, this is not fatal to Plaintiff's securities fraud claims." *Id.* at *15; Motion at 26.

Third, Defendants' disclosure argument (Motion at 26) again fails because "[b]y voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not so incomplete as to mislead." *FindWhat*, 658 F.3d at 1305.

Fourth, Defendants mischaracterize Plaintiff's allegations by ignoring allegations regarding Defendants' admissions demonstrating their knowledge of the risk long before the MDSC and the FDA's request, including, but not limited to, the Company's submissions of MDRs before and during the Class Period and

Defendants' knowledge that physicians were using the Company's products without proper training. Motion at 27; *see, e.g.*, ¶¶33, 39, 45, 49, 53-54.

Fifth, contrary to Defendants' assertion (Motion at 27-28), Plaintiff do not rely upon Defendants' positions alone to demonstrate scienter; rather scienter is based upon, among other things, Defendants' own admissions, the detailed CW accounts, as well as Defendants' access to information that contradicted their public statements. *HD*, 341 F. Supp. 3d at 1354-55; *Keippel*, 2019 WL 5698329, at *8. Accordingly, Plaintiff has adequately alleged scienter.

### C. Plaintiff Adequately Alleges Loss Causation

The PSRLA provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. §78u-4(b)(4). To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Such is the case here. On March 14, 2022, Apyx issued a press release disclosing that the FDA would be posting a MDSC related to the Company's Advanced Energy Products. ¶51. On this news, the Company's stock fell 41%. ¶52. These allegations are sufficient because they provide Defendants "with some indication of the loss and the causal connection that the

plaintiff has in mind." *Dura*, 544 U.S. at 347. Accordingly, Plaintiff has adequately

alleged loss causation.[5]

### D. Plaintiff Adequately Alleges Control Person Liability

Contrary to Defendants' assertion (Motion at 30), Plaintiff has adequately

pled a primary violation and has also sufficiently alleged the Individual Defendants'

control over the Company. ¶¶14-21; 74-78. Thus, Plaintiffs have adequately alleged

a control person claim. *Keippel*, 2019 WL 5698329, at *9.

## V. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion.

Alternatively, if the Court grants any portion of the Motion, Plaintiff respectfully

requests leave to amend. *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir.

2001) ("Generally, [w]here a more carefully drafted complaint might state a claim,

a plaintiff must be given at least one chance to amend the complaint before the

district court dismisses the action with prejudice.").

---

[5] Defendants claim that the Company's announcement cannot constitute a corrective disclosure because it purportedly "disclosed nothing new." Motion at 29. But the information, in fact, was new, and the Company's stock price plummeted 41% as a result. This massive stock price decline belies Defendants' assertion that the Company failed to disclose new information. And Defendants misapprehend the law when they suggest that a corrective disclosure must "reveal or correct . . . prior fraud." Motion at 29. Indeed, the Eleventh Circuit held that a district court erred in ruling that a disclosure did not "constitute either proof of fraud or proof of liability." *Luczak*, 812 F. App'x at 922. "A corrective disclosure can come from any source, and can take any form from which the market can absorb the information and react, so long as it reveals to the market the falsity of the prior misstatements." *Id*. at 920–21.

Dated: April 14, 2023   Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Ex Kano S. Sams II*
Ex Kano S. Sams II (*pro hac vice*)
Casey E. Sadler (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: csadler@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz (*pro hac vice*)
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

**DESMOND LAW FIRM, P.C.**
Leo W. Desmond, Esq.
Florida Bar Number 0041920
601 21st Street, Suite 300
Vero Beach, Florida 32960
Telephone: 772.231.9600
Email: lwd@desmondlawfirm.com

*Attorneys for Plaintiff William E. Hattaway*

# CERTIFICATE OF SERVICE

The undersign hereby certifies that on April 14, 2023, a true and accurate copy of the above document was electronically filed with the Clerk of the Court by using the CM/ECF system which will send Notice of Electronic Filing (NEF) to all counsel of record.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II