UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIAM E. HATTAWAY,            )
                               )   8:22-cv-1298-WFJ-SPF
          PLAINTIFFS,          )   Tampa
                               )   June 1, 2023
          v.                   )   9:59 a.m.
                               )
APYX MEDICAL CORPORATION,      )
ET AL.,                        )
                               )
          DEFENDANTS.          )

                  TRANSCRIPT OF MOTION HEARING
          BEFORE THE HONORABLE WILLIAM F. JUNG
                UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiff:
     MR. EX KANO S. SAMS, II
     Glancy Prongay & Murray, LLP
     1925 Century Park East
     Suite 2100
     Los Angeles, CA 90067

For the Defendants:
     MS. MEREDITH KOTLER
     MR. MARQUES TRACY
     Freshfields Bruckhaus Deringer US LLP
     601 Lexington Avenue
     31st Floor
     New York, NY 10022

     MR. JASON PAUL MEHTA
     Foley & Lardner, LLP
     100 N. Tampa Street
     Suite 2700
     Tampa, FL 33602-5810

Court Reporter:          Tracey Aurelio, CRR, RMR, RDR
                         Federal Official Court Reporter
                         801 N. Florida Avenue, 15th Floor
                         Tampa, Florida 33602
                         (813) 301-5448

          Proceedings recorded by mechanical stenography,
transcript produced by computer.

_____

(Proceedings commenced at 9:59 a.m.)

THE COURT:  Good morning.  Let's call the case, please.

THE COURTROOM DEPUTY:  Court calls 8:22-cv-1298-WFJ-SPF, William E. Hattaway v. Apyx Medical Corporation, et al.

Counsel, if you can please state your appearance for the record starting with the plaintiff.

MR. SAMS:  Good morning, Your Honor.  Ex Kano Sams from Glancy Prongay & Murray on behalf of plaintiff.

THE COURT:  Counsel.

MR. MEHTA:  Good morning, Your Honor.  Jason Mehta of Foley & Lardner.  And with me is Meridith Kotler from Freshfields.

THE COURT:  All right.  Thank you.

I was telling my staff I feel kind of guilty you all traveled so far.  I know Mr. Mehta didn't, but you all traveled so far for this, and thank you.  In hindsight, we probably should have set it up on Zoom to save you the time and expense.

All right.  So I have read everything.  So we're here on the amended class action complaint, the motion to dismiss. There are several pleadings related to that.

So movant, why don't we hear from you.  Super

informal courtroom.  You can stand, sit, use the podium, use the chair, the table, whatever you want.  The only rule is you've got to be around a mic.  So since you are the movant, I will give you a little -- the only rule on time is all good lawyers are concise.  So say what you want me to know. Although I have read everything, I don't want to miss anything.  And then we will give you a brief rebuttal since it's your motion.

All right, counsel.  Thank you.

MS. KOTLER:  Good morning.  Thank you very much, Your Honor.  And I will stand at the podium.  It is a little easier with my eyes.

THE COURT:  Thank you.

MS. KOTLER:  So this case, as Your Honor knows, challenges Apyx's disclosures that accurately reported financial sales and revenue for 2021 and then transparently warned of the extensive regulatory oversight that Apyx faced in its business and the risks of adverse action if there was any noncompliance, noncompliance that never happened and never came.  It's a securities class action, as Your Honor just said, so it is subject to and has to meet a number of heightened pleading standards, specifying each statement that's allegedly false and the reasons why, pleading particular facts showing false statement or omission, pleading particularized facts showing a strong inference of scienter,

and then pleading facts showing loss causation.

What I was going to do, Your Honor, very briefly is just spend two or three minutes on the background.

THE COURT: Absolutely.

MS. KOTLER: And then I would turn to all four. I'm going to go in that order unless if Your Honor wants me to hit any of them in a different order.

THE COURT: That's great. Thank you.

MS. KOTLER: And Apyx makes energy technology products. They use helium plasma technology.

THE COURT: What is that? I'm a lawyer because I couldn't ever get in med school. Is that like a little torch, like a little thing that looks like a little welding gun or something?

MS. KOTLER: It actually has three pieces. It has a generator unit, a hand piece, and then a supply of helium gas. And what it does is it delivers a helium plasma beam of energy. So it's an energy modality, but the benefit is that it delivers the energy in a very precise manner and with cooler temperature than other energy modalities. So it lets surgeons operate with a high degree of precision, and it eliminates unintended tissue trauma around it.

THE COURT: Just curious.

MS. KOTLER: That's exactly where I was starting. It's always helpful to know what we're talking about. And as

Your Honor knows, it was approved in 2012 and throughout the class period for the general use of cutting and coagulating and ablating.  I googled that yesterday.  It just means removing tissue during surgery, but doctors were using the technology off-label for certain cosmetic surgery procedures including dermal resurfacing and tightening the skin in the neck and submental -- that's right around the chin -- area.

Off-label use is indisputably legal, Your Honor.  We have given you all the cites -- there's no question about that -- in our brief at pages 5 and 6.  Doctors can use products for any use that they think is appropriate.  What's illegal is if a device manufacturer promotes it for an off-label use, but doctors can use products off-label any way they want that they think is appropriate, completely legal.

And during the class period, Apyx repeatedly disclosed that physicians were using the Renuvion handpiece off-label.  You see that at Exhibits 4, 8, 11, and 25 in the materials we submitted.  They said it at earnings calls.  They had it at their website.  They also disclosed that they didn't promote the product for off-label use, and they disclosed they had a regulatory strategy, which was to conduct more studies and seek more clearances, precisely to get clearances for the different procedures that doctors were using off-label.

And so then, like any public company, they made quarterly disclosures with their financial reporting, sales

and revenues, and here they repeatedly announced and praised unquestionably growing sales and revenue. They beat guidance that was twice raised, and no shoe ever dopped in this case, Your Honor. Revenue stayed. The sales stayed. They went up, up, up. They beat it, and that's it. Sales weren't returned. The revenue wasn't restated or removed. It was just there.

In addition, every quarter they had a list of risk factors, like every public company does, and the risk factor that's relevant here is the risk factor about the regulatory oversight that they faced. They said that they faced costly and complex regulatory oversight, which is obvious. It's in the regulatory framework as well. They discussed the range of adverse actions they could face for noncompliance, including product bans, seizures, recalls, refunds, civil and criminal penalties. They disclosed that any adverse regulatory action could materially impact their business.

It's also undisputed, Your Honor, that throughout the class period, as required, they submitted what we call MDRs, medical device reports. Whenever a device manufacturer gets notice of a serious adverse event that reasonably suggests that their device may have caused or contributed to a serious injury, you have to file one of these MDRs. You have to do it within 30 days, before you finish investigating, before you determine what the cause was. They submit even if the event was caused by user error or by another product, and those MDRs

unquestionably are publicly available.  They go to the FDA, and then they go on the FDA's MAUDE website.

So why are we here?

On May 11 of 2012, three days before the end of the class period, the company was notified by the FDA for the first time that it intended to issue a safety communication, and that came out three days later on March 14.  It was a notice to doctors and patients.  It was not anything to Apyx.  It repeated exactly what Apyx had said throughout the class period.  The products were cleared and approved for certain uses, and they were not cleared yet or approved for other procedures like dermal resurfacing or skin tightening.  And it repeated what was already in the MDRs, that there was a series of adverse events reported as there are every year in connection with those procedures.  It repeated what the events were, which again were in all the MDRs.  The communication did not pull the product.  It did not require Apyx to do anything different.  It did not pull the existing clearances.  It did not make any claim that Apyx had done anything illegal.  It did not make any claim that Apyx had illegally promoted off-label use or any claim of any kind of noncompliance.

And in fact, as Your Honor knows from Exhibits 21 through 24, the safety notice was then updated twice in the next two months because in fact the technology had been cleared for additional uses in connection with certain

aesthetic procedures, certain dermal resurfacing procedures and certain procedures for loose skin around the neck.  That's it.

So plaintiffs now challenge on the basis of that disclosure or that safety communication all of the financial reporting for 2021 that came before and that risk factor that I talked about, about regulatory oversight.  There was no regulatory oversight.  And they say that those statements were false for four reasons:  That Apyx failed to disclose the off-label use by doctors; that such use allegedly inflated the financial results and lead to the increase of MDRs and likely regulatory scrutiny; and that financial performance would be adversely affected.

THE COURT:  Counsel, you made the point, and I understand, nothing was restated on the finances.  Is there anything in this record yet about earnings subsequent to the FDA May, whatever you want to call it, report?

MS. KOTLER:  Certainly nothing pleaded that they went down.  And there was no dip and certainly no dip for the period that's relevant, which is 2021.  There is no dispute the revenue, the earnings -- what's relevant here are sales and revenue.  So I didn't look at the other figures, but I think they all went up, and they didn't --

THE COURT:  Are those before me now or -- I don't want to speculate.  Are they in this record?  Earnings.

MS. KOTLER:  Sure.  When you look at the press releases, Your Honor, they report a number of different --

THE COURT:  Post announce, post class period earnings.

MS. KOTLER:  Yep.  So I'm sorry, Your Honor.  I left it over here, but I had it.  So in the record in fact is the final earnings for full fiscal year 2021.

THE COURT:  Right.

MS. KOTLER:  And that is post class period.  Well, it's March 17, yes.  That's three days after the class period.  That's Exhibit 17.  Everything is up.  They report revenue.  They report net loss, suggested EBITDA.  It's all in there.  And as I said, final revenue beat the guidance.  That was twice.

THE COURT:  What I was asking was, and the thought would be if the FDA public announcement caused earnings in the subsequent, later quarters to drop.  I'm just curious.

MS. KOTLER:  I don't believe so, but it's not alleged, and it would be on them to allege it.

So turning then to the four bases for dismissal, the first is what we call puzzle pleading.  The PSLRA requires, 78u-4(b)(1), that a plaintiff specify each statement that's alleged to be misleading and the reasons why.

What we have here is a complaint that provides long block quotes of statements.  Certain portions are italicized

with bold or italics, but long block quotes followed verbatim by the same three long paragraphs. So you have several challenge statements, these three paragraphs, several challenge statements, the same three paragraphs, several challenge statements, and the same three paragraphs. And it never matches what's in those three paragraphs or portions of those three paragraphs to the specific statements or portions of statements that are being challenged.

And a number of cases that we cited to Your Honor, including *Anastasio* and *Meide*, say that that violates the PSLRA because plaintiffs shouldn't leave it to the Court to mix and match the portions that are challenged and this list of the exact same reasons for falsity that apply. Similar, Your Honor, to the shotgun pleading cases where a Court is left to sift through factual indications and match them to the claim. So that's just sort of a pleading matter up front.

More substantively, the complaint fails to plead facts indicating a false statement or omission. I think this is what Your Honor may have been getting at with your question about subsequent loss of earnings, which again is not alleged. There is no actionable misstatement here on financial reporting.

The Eleventh Circuit is very clear that when you've got accurate recitation of past earnings, those are unactionable, full stop. That's the *FindWhat* case and other

cases that we cited.  The financial reporting was accurate. There's no dispute about that, nor is there any pleading that explains how the revenue number or the sales number could have been "inflated" by what is unquestionably legal off-label use.

THE COURT:  I guess one of their beefs -- and maybe, counsel, correct me -- is you didn't describe the magnitude of it, and then the FDA doesn't like it.  It's disfavored by them, and it was a big deal, and you kind of just failed.  You knew it was, you know, a large problematic piece and you kind of pooh-poohed it and waved at it.  But turns out when the FDA kind of by their lights dropped the boom, you know -- I don't want to keep using metaphors -- but it seems to me they contend that it was fraud and you did not describe the full nature of the risk that you were aware of.

MS. KOTLER:  So a number of things there, Your Honor, that are problematic, and I understand you were just characterizing their allegations.

THE COURT:  Yes.

MS. KOTLER:  There is not a single fact pled that this was "fraud."  There's not a single detail as to the timing, the scope, the use of this.

THE COURT:  The two and four months kind of suggests it's problematic or concerning.  And I thought they said that we used something called -- this is from memory -- FindDoc or something, and everybody in the building, the suggestion is,

knew that we were selling a whole lot of this stuff off-label.

MS. KOTLER:  Yep.  So I think then that takes me to my next point, Your Honor, which is that plaintiffs are just wrong that the FDA frowns upon this.  Off-label use is 100 percent legal.  And you can look at pages 5 through 6.  In fact, as the -- I think it's the Supreme Court that we cited says it serves a very important purpose -- and the Eleventh Circuit that we cited as well -- is a common medical practice, and performs an important therapeutic role, and we cited the Eleventh Circuit.  It is both legal and commonplace.  The FDA, Your Honor, with all due respect, does not pooh-pooh off-label use at all.

THE COURT:  No.  They said you did, that your client did in the description of the prevalence of off-label use.

MS. KOTLER:  Well, I would think that Your Honor has to just look -- don't take my word for it or theirs.  Look at what the disclosures say.  The client did not pooh-pooh anything.  In fact, every time in the earnings calls you see them, the analysts say we know these procedures are going on. The analysts say we know they are going on all the time, which, by the way, shows you a hundred percent commonplace, everybody knew it because it's legal and okay.  And the company said yes, yes, doctors do this, they're allowed to do it.  And then it forthrightly and smartly said, and we've got a regulatory strategy, which is we're going to go and get

clearances for these things so we can also legally promote them.

So Your Honor really put your finger on what I had hoped to get across today, which is the fundamental sort of incorrect premise this whole case is based on, that there is something wrong or nefarious or hidden about off-label use. It was completely known but also very forthrightly acknowledged. Again at the exhibits that I described -- there's just a couple examples -- 4, 8, and 11 are each of the quarterly conference calls. And we also submitted at 25 what was the website page at the time, which very clearly says dermal resurfacing is an off-label use. And we don't promote it for that, but off-label use is, again, commonplace and legal.

THE COURT: One of the problems is it's off-label. So every, you know, half-baked doc who is not trained in this and there's no black box warning, you know, because it's not on your, whatever you call it, the list that comes with it. Maybe I'm talking about pharmaceuticals and not medical devices, but it's ad hoc. You don't send out in-service trainers to all the big hospitals or all the big derm places to train on submental -- which I had to google also -- submental use because it's not approved; therefore, you can't; therefore, it's a bunch of docs kind of doing what they want to do.

Anyway, I mean, I understand completely the off-label uses. It's not illegal. It's only improper if you promote it or advertise it. They are suggesting that you countenanced it at a minimum with their informants, right?

MS. KOTLER: Well, the informants merely say -- I'll go to the informants. CW2 just says it's used. So that doesn't say anything different than what the company did. And CW1 mostly says that, it's used. And CW1 has his or her view that it's problematic, that is the cases are they clear. That's neither here nor there. And then CW1 has this one statement that says -- I'm just going to get the exact language -- unnamed -- well, it's unnamed members of the clinical team would discuss other unnamed representatives who would promote the product at undescribed times in undescribed places at an undescribed scope, and most importantly completely unconnected to our defendants, because in order to have scienter, the defendants have to know about the numbers.

I also want to stay, Your Honor, we're here on a -- as you know, this is an investor class action. If the beef here is that, you know, plaintiffs don't like off-label use, that's not the question for Your Honor. The question is, were the statements, were the statements that were made, the disclosures, misleading? And the relevant point is that reporting financial disclosures accurately, revenues, sales that unquestionably were made, that unquestionably were

positive, there is no duty to say something different, or you can't say that those revenues and sales, which were 100 percent legal and 100 percent capped were false.  That's what the securities regime requires.  There may be a different view if they want to lobby the FDA or lobby Congress to change what one needs to do vis-a-vis labeling or communications, requiring communications to hospitals, as Your Honor noted, or whatever about off-label use, but this is a securities class action about the disclosures that are made to investors.

So going back, no false, no actionable or false statement regarding the unquestionably accurate financial reporting.  And then -- and those were made every quarter.  So they challenged them in May, August, November, and then January of 2022.

And then the only other statement that they challenged, and they have to have a statement to challenge, is the regulatory oversight risk factor that was given in May, August, and November 2021 -- those were the only times.  That was the last one -- saying very clearly we operate in a heavily regulated industry.  There's a range of adverse actions we could face if there is any noncompliance, and that could harm us.

There is no dispute that as of November 2021 there had been nothing from the FDA.  Nobody had heard from the FDA.  There was no suggestion that the FDA was going to do anything

whatsoever.

Now, they initially argued that that risk factor was false because some risks had already materialized by November of 2021 because of the safety communication that came out and then the fact that even weeks after that, the FDA asked for some stronger language on the website. And as we pointed out in our moving papers, well, that doesn't show falsity at the time statements were made because it was months after the fact.

So then the opposition pivoted and said, well, the risk had already materialized because the company had been filing MDRs. The problem there is twofold. One, that's not alleged in the complaint, but regardless there was no materialized risk of adverse regulatory action from the filing of MDRs.

Your Honor, filing MDRs, whatever number, shows regulatory compliance, not noncompliance. They filed them every time there was an event. They filed them appropriately, correctly. There's no claim they didn't file them, they underfiled them, they underreported, nothing.

THE COURT: Your next point is stronger, which is that in an absolute amount more were filed but we were selling a lot more of this product, and so the percentage went down from .03 to .02 or something like that.

MS. KOTLER: I think maybe I emailed my talking notes

to Your Honor last night.  That's exactly my next point.  That's correct a hundred percent.  The number went up, but the procedures doubled, so the incidence rate went down.  And of the 32 in 2021, they either, it turns out, were not attributable to the device or were events that were precisely within the risks of the stated risks on the product labeling.  But, of course, regardless, there was never any adverse regulatory action that came.  What was the safety communication?

The safety communication was a statement that said, folks, here's what this product has been approved for.  Here's what it hasn't been approved for.  I should say here's what it hasn't yet been approved for, because indeed in the months that followed it was in fact approved for two more things, two more big pieces of that.  It didn't pull the product.  It didn't pull the clearance.  I didn't make Apyx do anything.  It didn't say Apyx had done anything wrong whatsoever.  So you didn't -- there was no materialization of the risk that could have rendered this risk factor false by November 2021 when it was last said or really at any time.

So you've got no affirmatively false financial reporting.  You've got no affirmatively false risk factor.  That leaves them with their main theory, which is -- and really their only theory -- that there was some omission somehow, and the amended complaint points to four.

The first is they say that Apyx didn't disclose the off-label use.  That's just, Your Honor, with all due respect not correct.  You just can look at again the exhibits we put in which the Court can consider.  That's not disputed.  The earnings calls and the website makes very clear that off-label use was happening, it was commonplace, it was known.  We also submitted some articles that mentioned it too, but Your Honor doesn't even have to rely on the articles.  Apyx said it itself.

Then they said -- they claim that there was an omission about the number of MDRs, that there were MDRs filings, that it increased.  But as *Rice* and *Shapiro* hold, MDRs are publicly filed.  There is no duty to separately disclose them when you're reporting your financial results or otherwise.

And even if there was a duty to publicly -- to repeat all of your MDRs that are publicly available in your financial reporting, the omission of that wouldn't have been material.  So the Supreme Court in *Matrixx*, and then we have the *Miyahira* case, make it very clear that just because you have adverse safety events doesn't -- filed in an MDR which, by the way, is not proof of causation because you have to file so quickly and just when you have a reasonable suspicion.  The filing of MDRs is not material unless and until you can make a pleading or an allegation that there was a significant risk to the commercial

viability of the product.  Can't possibly make that claim here because the product not only remains on the market and is sold and makes money, but in fact even the safety communication was amended to make clear that it had been approved for these additional uses.

Then they say that there was an omission of the likelihood that the company was going to incur regulatory scrutiny.  This one is the one that perplexes me the most, Your Honor, because Apyx operates in one of the most heavily regulated industries in the world, right?  It's the health and safety industry.  And they regularly disclose that they were always subject, of course, to extensive regulatory scrutiny.  It's not like they were going to have different scrutiny or more security.  They're always under scrutiny, and they said that.  And they said that there's always a risk of adverse action for noncompliance, but again they didn't ever get -- they didn't ever commit any noncompliance, and they didn't ever have any action taken against them for noncompliance.

And then finally they say that there was -- or at least the complaint says there was a risk -- there was an omission of the risk that regulatory scrutiny would adversely impact Apyx.  Again, that's exactly what's in the risk factor, but again there wasn't an adverse impact in how Apyx operated.  It didn't -- the product didn't come off the shelves.  The clearance wasn't removed.  In fact, it was broadened.

And as Your Honor said in the *Bhatt* case, there can be no omission.  There can be no actionable omission when the very information is disclosed.  And this isn't some truth on the market defense.  This is just the very basic point, as Your Honor noted in *Bhatt*.  If the information is disclosed, you can't claim there's an omission.

So then they rely on two other things to try to show falsity.  One is this April 1 FDA request which is after the class period.  So what happened was in May, at the conference call in May of 2022, Mr. Goodwin noted or described that the FDA had asked for changes to the website and training materials on April 1, well after the class period.  But what were those changes?  Just requesting stronger language of what had already been given to make it even clearer to doctors these haven't been cleared and to remove certain language that they were worried, might -- in the abundance of caution might imply that you could, you know, that they could be used elsewhere.  Again no charge, no finding that Apyx was promoting this.  The FDA just wanted to just change the language to make it even clearer.  This was not some admission that the statements were false at the time that they were made.

And then that leaves the CWs.  And as we talked about, Your Honor, what the CWs say is the product was being used off-label, 100 percent legal, everybody knew it, Apyx

disclosed it, and then this vague double hearsay statement which we've cited a number of cases, Your Honor, from *Mizzaro, Durham.* They are at page 21 of our moving brief, Footnotes 15 and 16, many others. The PSLRA requires for confidential witnesses some particularity, what was said, what were the numbers, what's the scope, what's the magnitude, what's the duration, and importantly that the defendants know about it.

So moving on, Your Honor, I don't think I'm -- I mean, I'm happy to address puffery or forward-looking statements, although I think we've got those in our brief, but a number of the statements that we laid out at Annex A, statements like we're pleased or, you know, exceptional growth, strong growth. Those are the kinds of -- by the way, all accurate -- but those are the kinds of generalized, vague, nonquantifiable statements that are unactionable.

Your Honor, in *Keippel* -- that's another securities case that Your Honor had. Maybe I'll spend a minute talking about *Keippel*. Your Honor did note that what might be puffery sometimes could otherwise -- has to be considered in context and could otherwise be actionable. *Keippel*, Your Honor, I think explains or shows why there's nothing actionable in this case.

So in *Keippel*, you had a business that was found to be a bait and switch scam as proven by an FTC enforcement action with a court order shutting it down. There was never a

viable business, with deception that permeated the entire business relationship that had been found by a Court and an FTC receiver.

And the public statements, Your Honor, were that there was exceptional customer service and low customer complaints. And what Your Honor noted was that the complaint pointed to internal documents showing thousands of complaints and internal emails between the defendants saying that the complaints were out of control. So you had specifically pleaded facts known by the defendants that their statements directly on point, directly addressing that were false. And of course you also had insider sales in there.

We have none of that here. We've got no insider sales. We've got no internal documents. We've got absolutely nothing connecting this vague statement that some people talked about other people who said there was illegal promotion, with no details. That is not remotely connected to the defendants.

And in fact, both of those people left Apyx months and a year and a half before the class period. They claimed no communication or connection to the defendants, no relationship with them. So *Keippel* really underscores what is missing there.

And then that takes me to scienter. And on this, Your Honor, I think the allegations are even weaker, and in

many cases courts don't actually have to reach all of the elements.  If any one is not met, one can stop there and just address scienter or just address falsity or just address puzzle pleading as a basis to dismissal because any one of the four defects is sufficient to dismiss.  All four are of course as well.

On scienter they have to show either a motive or intentional or severely reckless conduct.  On motive they don't and can't plead any insider sales, which as Your Honor noted in *Bhatt*, the Eleventh Circuit has noted undermines an inference of scienter, so it puts them behind the eight ball.

As for knowing or severely reckless conduct, they'd have to show highly unreasonable conduct.  They have no internal documents.  They have only what these confidential witnesses, who again are unquestionably insufficient under the Eleventh Circuit's decision in *Mizzaro*, in *Axogen*, *Mogensen*, because they claim no relationship with or communication with the individual defendants.

THE COURT:  And is this a Rule 9 standard?

MS. KOTLER:  So it's -- yes, it's both Rule 9 and the PSLRA.  So the PSLRA, as I said in the beginning, requires for scienter particularized facts showing a strong inference of scienter.

THE COURT:  So maybe it's Rule 9 plus given the act statute.

MS. KOTLER:  Correct.  I mean, what courts typically say is it's both.  They both apply and it fails under both, but I would agree with you, Your Honor, that the PSLRA does require even more than 9B, the particularized facts giving rise to a strong inference of scienter.  And again, *Mizzaro, Axogen, Mogensen,* they all lay out what confidential witnesses have to be able to say to meet that standard.  And the minimum -- at a minimum they have to be able to plead details that were conveyed to the individual defendants to show them so that they would have known or should have known that their statements were false.

So what else do they rely on to plead scienter?  They also rely on this supposed post class period admission when the FDA requested changes to the website on April 1.  But again, this is clear and I think they recognize that doesn't work because the April 1 request for changes didn't come until a month after the class period.

THE COURT:  But doesn't that show that there was a problem and you all were aware of it?

MS. KOTLER:  No, Your Honor, because for two reasons.  One, not that as to y'all were aware of it, no, because the FDA didn't say anything until April 1.  So that's always a theme in the case.  You have to know when somebody was made aware of it.  And here they weren't made aware of the FDA request until April 1, which is weeks after the class period,

months after the last challenged statement.  The last challenge statement was the financial reporting in January.  And the last risk factor was even earlier in November.  So that's almost six months after the last risk factor, but more importantly I don't think that this shows -- this doesn't show a problem that the FDA wanted stronger -- decided it wanted stronger language.

THE COURT:  Probably, but suppose -- I have no idea, but suppose it gets into discovery and the earlier website shows all these kind of -- what's the right word?  Aesthetic -- you know, right now the thing is just a torch to cut people, but your website shows, like these magazines we get, the Tampa Metro magazine, it's just full of plastic surgery stuff.  It's all these beautiful people.  Look what Dr. Smith did to me.  Come to our clinic, yada, yada.

Let's just say your website had a lot that was more than just cutting open someone, laparoscopic surgery.  Here we have body beautiful looking stuff.  And I'm not saying it does.  I have no idea.  I'm sure that counsel, if he got to that point in the case, would take a look at that.  But, you know, that would certainly support their contention that, oh, you all knew you were pitching it off-label.  You're not supposed to, and the stock went down because you got called on it publicly.

MS. KOTLER:  So, no, Your Honor, I think for two

reasons.  Number 1, again, this is a securities class action.  And Congress has been very clear you have to plead your facts up front.  You don't get into discovery.  That's the point of PSLRA.

THE COURT:  Of course.

MS. KOTLER:  But second, again -- so there has to be a statement that's false because of the omission.  So how is -- the financial reporting cannot possibly be false.  The sales and revenue that came in legally, were legal sales, cannot be false.  Even if for the moment I'm going to accept your proposition that the company was promoting the product off-label, they just literally as a matter of law could never be -- the financial reporting couldn't have been false because the sales were the sales.  The revenue was the revenue.  It never went away.

As for then the only other statement that's challenged is the risk of adverse regulatory action that might come.  Again, they'd have to show that somebody knew and believed back in -- you know, May, August and November the risk had already materialized, that the adverse action was then coming, it was happening.  Again, they can't possibly claim that.  Even if they could show -- I'm not even sure what they would be showing by more pictures on the website that weren't a change.  I mean, the FDA found whatever it found, but again we know because it never happened, the FDA never

made a charge, let alone a finding ever that there was you illegal promotion. And the only factor that they pled, the only one, it's not even a fact, is unquestionably insufficient under all of these cases that a confidential witness who is not named who left the company months before the class period even started, unnamed people said other unnamed people talked about promoting off-label use. And completely and utterly there's not even a claim that it's connected to the defendants. So that does not get them anywhere. That's just -- that doesn't get them anywhere near what they have to plead to get past a motion to dismiss in a securities class action.

You don't have to look past *Mizzaro* from the Eleventh Circuit in the *Home Depot* case over excessive rebates. They had five or six confidential witnesses there. And what the Eleventh Circuit said -- and they had even more detailed information. They pointed to a specific plan. They pointed to communications. They said none of these people have any connection to the individual defendants. They don't claim it. They have to plead particularized facts to get past a motion to dismiss because securities class actions are not fishing expeditions. The cost of them is so high that you can't have folks running in because some news -- I don't even know how it was bad in this case, but some news was announced and the stock dropped.

Also for scienter they claim they want to rely on the core operations doctrine. The Eleventh Circuit has never adopted that. It's insufficient in and of itself. They still have to plead facts, just what we talked about, facts showing that the defendants knew their statements were false, that they knew that the company was illegally promoting to a level and a degree such that the FDA would take some kind of action against them. They haven't pled that at all.

And they pled nothing whatsoever on Ms. Semb who is the CFO, literally nothing about her, how the CFO would know anything about off-label use or the promotion of off-label use.

And finally, as Your Honor knows from *Bhatt*, within scienter you also have to consider the nonfraudulent inferences. So on the one hand they've got, as far as I can see, no plausible theory of fraud, no insider sales, no evidence that any defendant knew anything that its statements were false, but on the other hand accurate reporting of the financial performance, accurate filing undisputed of the MDRs, accurately and transparently disclosing the risk of adverse regulatory action. And it's just implausible that the company unquestionably did perform and spend a lot of money to do more studies, put in more submissions and get the clearances for the off-label use. It doesn't make any sense that they would be hiding something or doing all this if they thought that the

off-label use was illegal or would never be found safe, right?

In fact, if Your Honor was right and people knew and they were just pooh-poohing it and just doing it, why on earth would they have gone and spent so much money to conduct studies, put in the submissions for approval and get the approval, right?  Because if they're doing all this on the side and promoting it on the side, the FDA is never going to give them the clearance.  Let alone, why would they pay the money to even try?  It doesn't make any sense.  And that's exactly the kind of thinking and balancing that Your Honor has to engage in at the dismissal stage, as Your Honor noted in *Bhatt* and under the Supreme Court precedent.

So the last thing I will say very briefly is loss causation only because Your Honor -- something Your Honor asked me to think about.  Okay, there was some disclosure and the stock dropped.  The Eleventh Circuit in *Meyer* and others is very clear.  The fact that you've got a disclosure followed by a stock drop is not sufficient to show loss causation.  That's another element.  They have to show that whatever fraud was there was baked into the stock price.  And then when there was an announcement, it pulled out the fraudulent inflation, the inflation from the fraud.

In other words, they have to show a corrective disclosure.  And that's what they are trying to do through the MDSC, but in order to show that that announcement put its

finger on the fraud and pulled out the inflation that had been baked in, they have to do two things. They've got to plead that the corrective disclosure or the supposed corrective disclosure provided new information and that it revealed that there had been fraud before, but the safety communication didn't do anything like that. It literally said what Apyx had said all along. These are the approved procedures. These other procedures have not yet been shown to be effective or safe. And then of course they amended the safety communication as they cleared more uses that were shown to be safe and effective. So nothing -- and then it repeated the adverse offense that had been publicly reported, all of which were in the MDRs. So it didn't include anything new. And it didn't reveal any fraud. It didn't reveal that the financial reporting was somehow false. And it didn't reveal that somehow a risk of adverse regulatory action had materialized and been there all along, including because it didn't say that Apyx had done anything wrong. It wasn't a notice to Apyx. It wasn't a finding with respect to Apyx. It didn't say anything about Apyx and Apyx's conduct whatsoever.

So I have gone on too long. I apologize. I hope I haven't been too long. But unless Your Honor has questions, I'll sit and --

THE COURT: I appreciate that. And we'll let you come back for a short button-up.

MS. KOTLER:  Thank you very much.

THE COURT:  And forgive me, counsel.  Is it Sams? How do I pronounce your last name?

MR. SAMS:  Sams, yes, Your Honor.

THE COURT:  Mine is usually mispronounced.  I don't care much, but I always try to make sure.

Mr. Sams, I'll be glad to hear from you for the plaintiff.

Thank you.

MR. SAMS:  Yes.  Thank you, Your Honor.

THE COURT:  Yes, indeed.

MR. SAMS:  And I will try and heed Your Honor's caution to be concise.

THE COURT:  You are here, so glad to have you.  You came a long way, so say your piece.

MR. SAMS:  Thank you, Your Honor.

I think Your Honor had a question initially about whether or not there was information pled in the complaint that indicated how the statements that we allege are false and misleading impacted the company.

I think the most important fact on that point to illustrate is that the stock price fell 41 percent once the FDA indicated that a communication was necessary.  That's 41 percent.  So investors are keenly interested in the company's performance.  And the fact that the company's stock

price plummeted 41 percent is very important to show that their statements caused a huge impact on the company.

Now, counsel suggests that all this information was publicly known, that the MDRs were filed and reported publicly, that the off-label use was legal and that they disclosed it, but they failed to explain why the company stock price would fall 41 percent if investors have that information. Clearly the market was reacting to that new information. So that's information that investors did not have and that caused that huge stock price in the company.

And I think Your Honor was exactly on point when you indicated that the company failed to disclose the magnitude of the risk that is alleged here. So it's not just the fact that off-label use was illegal. And it's not just the fact that MDRs may have been publicly available. It's the fact that coupled with the allegations that we have in the complaint with the confidential witnesses showing that the company was promoting their products off-label, along with the huge increase in MDRs in 2021, more than double the MDRs that occurred previously, those were risks that the company did not disclose to investors. And then once that communications report came out, investors saw what the company already knew, that the off-label use coupled with the rise in MDRs had a huge impact on the company and created that risk that they failed to disclose. So I think Your Honor was exactly on

point by pointing that out.  They did not disclose a full risk to investors, and that caused that 41 percent stock price decline.

So I think it's important to show that counsel suggests that the fact that they were using the product off-label was legal completely misses the point.  The point is the company was knowingly accepting these risks of off-label use, not disclosing that to investors, not disclosing the fact that the risk coupled with the fact that the MDRs were increasing created this risk that they didn't disclose to investors and that caused the stock price to decline.

And I think Your Honor mentioned that the percentage issue, you noted that there was an absolute number that increased, but our response to that would be that even though there was a smaller percentage that increased, the fact that it doubled from 2019 or 2020 to 2021 coupled with the fact that these were serious risks that patients were enduring -- they were suffering burns to their skin -- those are risks that the company knew about that was displayed by the statements that the CWs made, and they failed to disclose those risks to investors.  And that's basically what we allege in the case.

Also, Your Honor mentioned the scienter issue.  There was a question that counsel raised about whether or not the CWs adequately showed scienter.  I just want to highlight some

of these statements that the CWs made so that Your Honor is aware of them.

CW1 was a senior surgical device specialist at the company.  They stated that there were concerns to company employees regarding physicians using the product for dermal resurfacing and that it was all about the numbers.  And that's a quote from CW1 that it was all about the numbers.  So the most important thing that the company was focused on was their financial statements.  So they ignored the risk that the company was facing and focused solely on the numbers.

Also, counsel made a reference regarding the core operations inference.  And counsel mentioned that there is no allegation that they knew about the facts that were alleged. Well, frankly that just misstates the standard.  The standard is not whether or not they knew their statements were false. It is whether they were reckless in making those statements.

So the fact that they had these MDR reports that were increasing throughout the year in 2020 coupled with the fact that CWs were stating that they were promoting their products for off-label use suggests that there was a risk that they recklessly avoided and they failed to disclose that risk to investors.  So it's not just whether or not they knew about the risk.  They were reckless in not reporting that risk to investors.

Also, there was comment made about loss causation and

whether the disclosure was related to the misrepresentations. That is not a question in this case. Lost causation is adequately alleged. The safety communication directly related to the failure to disclose that we allege. There is no question that once that statement was -- once that announcement was made, that risk was related to the allegations that we make regarding the failure to disclose the risk that the company was hiding from investors.

Counsel also referenced the puffery statements that were included in the annex in the back of their motion to dismiss. I could go through all of these statements. I know that for a lot of the points that counsel made, we addressed the issues within the briefs. So if Your Honor would like, I could go through each of their statements within that annex and show how it was not puffery. Your Honor's opinion on the *Keippel* case was directly on point to this issue. You have to read those statements in context. And in context they were false and misleading for the reasons that we alleged.

And finally, Your Honor, I think the admissions that we alleged for scienter, I think the Court was right on point when the Court mentioned that the stock went down because the FDA called the company out on their misrepresentations. So that's what happened here. They were using the product or they knew that doctors were using the product off-label. They promoted it off-label.

There was that, as Your Honor mentioned, Internet site DocMatter where the company would interface with physicians.  They would know that the doctors were using this product off-label, and yet they failed to disclose the risk of this off-label use and promotion.  And when the FDA did call them on it, the stock price plummeted and caused severe harm to investors.  And that's what this case is about.

I'm happy to answer any questions that Your Honor has.

THE COURT:  No.  I think I have it.

You agree that the scienter requirement is a combo, sort of a Rule 9B and the statute?

MR. SAMS:  Yes, I do, Your Honor.

THE COURT:  It's so familiar to you all.  We just had a patent case in here.  There were so many acronyms.  The statute is PSLRA or roughly?

MR. SAMS:  That's right, yes.

THE COURT:  Those cases shed light on the scienter requirement?

MR. SAMS:  Yes, they do.  And it is a heightened pleading requirement, but we met it for the reasons we stated in our opposition, including the fact that there are admissions that the company made that clearly show that they had knowledge of the off-label use and the risk that was posed by the off-label use, the two CWs that Your Honor mentioned

that also stated that the company was promoting the products off-label, and also the core operations inference.

Counsel mentioned that there are no facts that are alleged, but in Paragraph 2 we allege that that market, that segment of the market accounted for 80 percent of the company's revenue.  So that's clearly a core of the company's operations, and the company's officers and directors would know about that.

THE COURT:  Well, thank you, counsel.  I appreciate it.

All right, Ms. Kotler.  Why don't you do a very brief button-up for us as movant.

MS. KOTLER:  Thank you, Your Honor.  I just wanted to make four points.

One, you just heard that the company accepted the risk or failed to disclose the risk of off-label use.  That can't be squared with unquestionable precedent.  There is no risk of off-label use.  That is legal.  Doctors are allowed to use it.  It's commonplace, it serves a good purpose, and it has nothing to do with Apyx with one exception.  Off-label use is allowed.  It's legal.  It's commonplace.

What the company cannot do and what we keep hearing blending of is promoting off-label use.  Off-label is okay; promotion is not.  When you look through that amended complaint, there is literally one allegation regarding the

promotion of off-label use.  Nothing else, nothing else about promotion.  And that is CW2 saying some people said other people said that there was promotion of use.  Nothing about timing, scope, magnitude, and most importantly not tied to the defendants.

And you just heard that CW1 also said it was all about the numbers.  I was ruffling through the cases, Your Honor, because it reminded me exactly of the statement in *Durham* that was found woefully deficient, which was a CW's opinion that the numbers don't match up.  A CW saying the numbers don't match up or a CW saying it's all about the numbers does not provide facts, detailed facts showing that the defendants knew or were severely reckless in making false statements.

Also, I just heard the statement that the FDA called the company out for its misrepresentations.  That's just wrong on a number of levels.  The FDA didn't say anything to the company or about the company.  Again, you shouldn't take my word for it.  You can read the safety communication itself. It was a communication to doctors and patients saying doctors are using this off-label.  That's on the doctors.  That's their conduct, which is legal.  Doctors and patients, be aware.  We haven't cleared these yet -- yet.  They haven't been cleared.  Some of them were cleared.  That was a statement to doctors and patients.  It wasn't a statement to

Apyx or about Apyx or about Apyx's conduct.

And the last thing I'll end with is, you heard at the beginning from plaintiffs the impact on the company, the stock drop. So a stock drop in and of itself does not plead falsity. That's the *Matrixx* case. It doesn't plead omissions. It potentially leads you to loss causation, but even there, again, *Meyer* in the Eleventh Circuit is very clear a stock drop following an announcement is not sufficient even to plead loss causation. You have to plead that there was something in the announcement having to do with the fraud that pulled out, made clear and pulled out the artificial inflation that caused the stock drop, because otherwise the stock drop could have been caused by anything else that happened that day. So that's what the loss causation precisely is at the pleading stage. They have to be able to plead that there was something in that announcement related to the fraud such that the stock dropped because of the fraud.

Unless Your Honor has any questions, I'll sit. Thank you very much.

THE COURT: No. And let me say it's such a pleasure to have counsel of this quality presenting, and I'm very grateful to both of you.

All right. Well, we will attempt to bring -- we, and it's not the empirical we because there's a whole crew up here. We will attempt to bring our work product to your

collective level and rule, you know, relatively soon.

So thank you all very much.  I appreciate it.  Good day.

(Proceedings concluded at 10:58 a.m.)

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA       )

### REPORTER TRANSCRIPT CERTIFICATE

     I, Tracey Aurelio, Official Court Reporter for the United States District Court, Middle District of Florida, certify, pursuant to *Section 753, Title 28, United States Code*, that the foregoing is a true and correct transcription of the stenographic notes taken by the undersigned in the above-entitled matter (Pages 1 through 41 inclusive) and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States of America.

                                    /s    *Tracey Aurelio*
                                    _____
                                    Tracey Aurelio, RMR, RDR, CRR
                                    Official Court Reporter
                                    United States District Court
                                    Middle District of Florida
                                    Tampa Division
                                    Date:  June 6, 2023